S91P0865. HALL v. THE STATE.
(415 SE2d 158)

SMITH, Presiding Justice.

The appellant, Dennis Hall, was convicted by a jury in Barrow County of the murder of his ten-year-old son Adrian, of two counts of cruelty to children, and of discharging a firearm near a public street. He was sentenced to death for the murder. He appeals. We affirm.

1. During his marriage, Hall's alcohol abuse and abusive behavior towards his wife and three children resulted in numerous occasions in which the police were called to restore order to the household. Hall once locked his family out of the house when the outside temperature was below freezing. On another occasion, his wife told police that Hall had struck her in the head with a pistol. He also once threatened to shoot his wife and fired a shot into the air. On none of these occasions, however, did she press charges.

On Sunday, January 7, 1990, Hall began drinking early in the morning and drank throughout the day. As Hall watched television that afternoon, his son Adrian played with a toy remote-controlled tractor. Hall told Adrian to stop, because the toy was interfering with his television reception. When Adrian did not cease playing immediately, Hall went to the boy and struck him in the head. This precipi-

---

tated an argument between Hall and his wife concerning the necessity for the severity of Hall's punishment. Hall responded by searching for his shotgun. His older daughter took the shotgun outside and hid it in the car. Meanwhile, Adrian got the pistol and took it outside. Hall found the shotgun and loaded it while his wife tried unsuccessfully to take it from him. He approached Adrian, who stood 10 to 15 feet away saying, "Don't shoot me, don't shoot me." Hall shot him in the chest as his wife, two daughters and his next door neighbors looked on. Hall went home, but returned a few minutes later to Adrian's body. Hall kissed his deceased son and told him he loved him. When his neighbor suggested it was "a little too late for that, you've done killed him," Hall responded, "Shit happens," and bragged, "I couldn't learn him nothing by beating him with a belt, so I guess I learned him something this time."

A test administered later that afternoon showed that Hall had a blood alcohol level of .32 grams percent. All who observed Hall that afternoon, however, testified that he was not overly intoxicated, was steady on his feet, and had only slightly slurred speech.

In a post-arrest statement to police, Hall claimed he shot his son in self-defense. Later, he claimed it was an accident.

The evidence supports the conviction for murder. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his first enumeration of error, Hall, who is black, raises an issue under *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), concerning the prosecutor's exercise of peremptory challenges. Noting that the prosecutor used six of his ten peremptory challenges to strike all six black prospective jurors on the qualified venire, Hall argues he has established a prima facie case of purposeful discrimination in the selection of his jury. See *Batson*, supra at 96. The state concedes this much (state's brief at p. 14), but contends it successfully rebutted the prima facie case by articulating race-neutral reasons for striking as it did.

After listening to the prosecutor's explanation of his peremptory challenges, the trial court stated that it was concerned only with the prosecutor's final peremptory strike. The other jurors were struck either because they were well acquainted with the defendant and his family, were closely related to persons who had been in trouble with the law, or had expressed a reluctance to impose a death sentence. See *Foster v. State*, 258 Ga. 736 (2) (374 SE2d 188) (1988). The final black juror struck by the prosecutor knew the defendant's mother. Moreover, the prosecutor had prosecuted her cousin. Nevertheless, the prosecutor explained that he had planned to save his last strike for a white prospective juror who had once been arrested on a "bad rap" and had "bad feelings" toward the judicial system. However, on the morning of the jury selection, the last black juror entered the

courtroom with the defendant's family and sat immediately behind the defendant's mother. The prosecutor stated that when he learned of this, he decided to exercise his last peremptory strike against the juror.

(a) The defendant, noting that no one observed the juror actually talking to the defendant's family, contends the prosecutor's explanation was insufficient to support his final strike. However, as we have explained, the prosecutor's explanation " 'need not rise to the level justifying exercise of a challenge for cause.' " *Gamble v. State*, 257 Ga. 325, 327 (357 SE2d 792) (1987) (quoting from *Batson*, supra). A reasonable suspicion about a prospective juror's impartiality that falls short of justifying an excusal for cause might well justify the exercise of a peremptory strike. This is such a case. That the prospective juror entered the courtroom with the defendant's family and sat next to them might have been mere coincidence, but there was at least some reasonable likelihood that it was not. We cannot condemn the prosecutor's reluctance to gamble on the significance of this occurrence.

(b) Pointing to the trial court's explanation that if the prosecutor could "articulate nonracial reasons for the strikes, he's entitled to exercise" them, the defendant contends the trial court failed independently to evaluate the prosecutor's explanations for his peremptory strikes.

Of course, the trial court may not simply give "rubber stamp" approval to "all nonracial explanations, no matter how whimsical or fanciful." *Gamble v. State*, supra at 327. The explanations must be sufficiently persuasive to rebut the prima facie case. But we do not read the trial court's extemporaneous remarks so parsimoniously as does the defendant. The record as a whole demonstrates the trial court's understanding of its role under *Batson*.

(c) As we noted in *Gamble*, supra:

A court charged with the duty of determining whether the prosecutor has rebutted a prima facie case may be less troubled by one relatively weak explanation for striking a black juror when all the remaining explanations are persuasive than where several of the prosecutor's proffered justifications are questionable. Similarly, a weak prima facie case may be rebutted more readily than a strong one. [Id. at 327.]

In contrast to the *Gamble* case, where the defendant was black and the victim was white, here both the defendant and the victim were black. Moreover, unlike the *Gamble* case where several explanations were suspect, here the trial court was concerned about the sufficiency of only one of the proffered explanations. The trial court in this case was authorized to conclude that the prosecutor had successfully re-

butted the prima facie case.

3. There was no error, as the defendant contends, in the pre-trial excusal of four prospective jurors who were college students enrolled in schools outside the county. The trial judge specifically authorized these excusals for "other good cause" under OCGA § 15-12-1 (a). (Their service was deferred to a later term. Ibid.) *Hendrick v. State*, 257 Ga. 17 (2) (354 SE2d 433) (1987).

4. There was no improper restriction of the death-qualification voir dire. It is not "permissible to ask a juror to describe the *kind* of case that, in the juror's opinion, would warrant a death sentence." (Emphasis in original.) *Blankenship v. State*, 258 Ga. 43, 45 (6) (365 SE2d 265) (1988).

5. The defendant next contends the trial court should have granted his motion to excuse for cause a prospective juror who admitted having an opinion about the defendant's guilt. The juror, however, testified that he could set aside this opinion, accord the defendant his presumption of innocence and decide the case on the evidence presented at trial. The trial court found that the juror was qualified. This finding is not clearly erroneous. *Spivey v. State*, 253 Ga. 187, 196-197 (319 SE2d 420) (1984); *Waters v. State*, 248 Ga. 355, 362 (2) (283 SE2d 238) (1981).

6. Previous difficulties between the defendant and his family were properly admitted to show the defendant's bent of mind towards the victim. *Wright v. State*, 184 Ga. 62 (8) (190 SE 663) (1937).

7. In his 6th and 7th enumerations of error, Hall (a) complains of the admission of testimony by two social workers about the possible effects on the defendant's two surviving children who witnessed the murder of their brother by their father, and (b) contends that the evidence is not sufficient to support his conviction on two counts of cruelty to children.

(a) The evidence is undisputed that the defendant's two surviving children were present and witnessed their only brother being murdered by their father. The two children, however, do not presently exhibit overt manifestations of having been traumatized by the event. In fact, according to defense testimony, they showed great affection for their father when he appeared at the victim's funeral (in the custody of law enforcement officers).

The first social worker testified that she is a caseworker with the Barrow County Department of Family & Children's Services. In her 16 years of service, she has worked with several hundred victims of abuse and trauma, including children who have witnessed siblings being seriously injured or killed. She testified that many such children repress such experiences and show no immediate outward signs of trauma, but that it often emerges years later.

The second witness is a licensed clinical social worker and thera-

pist. She testified that she would expect unconscious denial from a young child who witnessed the murder of a sibling, with no outward symptoms until the child was older.

Hall argues that the testimony was irrelevant because it described possible future trauma and not what the children experienced on the date of the murder and was otherwise inadmissible because the witnesses were not experts, and their testimony was speculation.

An expert witness is one who from education, training or experience has peculiar knowledge concerning some matter of science or skill to which his testimony relates. The qualifications of an expert are addressed to the sound discretion of the trial court. *Taylor v. State*, 261 Ga. 287, 290 (13 a) (404 SE2d 255) (1991). Expert testimony is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves and where such testimony would be helpful or necessary to assist the jury. *Jones v. State*, 232 Ga. 762, 764-765 (2) (208 SE2d 850) (1974).

The defendant was charged with "maliciously caus[ing] . . . cruel and excessive mental pain" to his two daughters (three and seven years old, respectively). See OCGA § 16-5-70 (b). The expert testimony was not offered by the state to establish conclusively that the two children had suffered cruel and excessive mental pain, but to counter the anticipated defense contention that, because they exhibited no overt manifestations of trauma, they had not experienced cruel and excessive mental pain. The expert testimony was properly admitted by the trial court.

(b) The jury was entitled to conclude beyond a reasonable doubt that the defendant's two daughters suffered "cruel and excessive mental pain" when they watched their father murder their only brother. OCGA § 16-5-70 (b). Moreover, the jury was entitled to conclude that the defendant maliciously caused this pain by wantonly and wilfully shooting his son "with an awareness of a plain and strong likelihood that such harm may result." *Rigenstrup v. State*, 197 Ga. App. 176, 180 (4) (398 SE2d 25) (1990). The evidence supports the jury's verdict on the two counts of cruelty to children. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

8. In the circumstances of this case, the defendant was not entitled to an instruction on either grade of involuntary manslaughter, OCGA § 16-5-3, or on accident. *Binns v. State*, 258 Ga. 23 (2) (364 SE2d 871) (1988); *Flanders v. State*, 188 Ga. App. 98 (2) (371 SE2d 918) (1988). *Beck v. Alabama*, 447 U. S. 625 (100 SC 2382, 65 LE2d 392) (1980), does not, as the defendant contends, mandate instructions on lesser offenses not supported by the evidence. *Hopper v. Evans*, 456 U. S. 605 (102 SC 2049, 72 LE2d 367) (1982).

9. The court's instructions concerning inferred intent were not erroneous. *Isaacs v. State*, 259 Ga. 717 (35 B) (386 SE2d 316) (1989).

10. The defendant argues the state should have been compelled to disclose the criminal records of its witnesses. The state claims it is not aware of any such convictions. The trial court did not err by refusing to compel the disclosure of that which apparently does not exist. Compare *Isaacs v. State*, supra at 723-724 (11).

11. The § b (7) aggravating circumstance authorizes the death penalty where the offense of murder is "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery." OCGA § 17-10-30 (b) (7). This circumstance has two parts. First, the murder must be "outrageously or wantonly vile, horrible or inhuman." These are words of common understanding having essentially the same meaning and are intended to help distinguish non-capital murders from those in which a death sentence may be appropriate. *Hance v. State*, 245 Ga. 856, 861 (268 SE2d 339) (1980). Second, the offense of murder must involve either torture, depravity of mind, or an aggravated battery to the victim (or a combination of these three elements). Id. Accord *West v. State*, 252 Ga. 156, 161 (Appendix) (313 SE2d 67) (1984).

The jury returned this verdict:

> We the jury find the following statutory aggravating circumstances to exist beyond a reasonable doubt: wantonly vile, depravity of mind, horrible, inhuman in that it involved torture.

The defendant contends this verdict is not a valid finding of the § b (7) circumstance. We disagree. Although the verdict's word order does not track the statute exactly, the verdict includes all the essential elements of the § b (7) circumstance and all the findings necessary to sustain a § b (7) finding. *West v. State*, supra. The jury's intent is shown with the requisite clarity. *Page v. State*, 256 Ga. 191, 194 (345 SE2d 600) (1986).

The defendant further contends the evidence is not sufficient to support the jury's § b (7) finding. Again, we disagree. The evidence, viewed in the light most favorable to the jury's verdict, shows a continuing pattern of abuse of the victim by this defendant, culminating in the death of the victim because he was playing with a toy. The defendant chased down and shot his ten-year-old son as the boy begged him not to shoot him. Afterwards, he first dismissed the significance of his act by claiming, "shit happens," then sought to justify the act first as a lesson in discipline, and than as an act of self-defense. The jury was authorized to conclude that the defendant's murder of his ten-year-old son was outrageously or wantonly vile, horrible or inhuman, and that it involved mental torture and depravity of mind. *Hance v. State*, supra; *Rivers v. State*, 250 Ga. 303 (298 SE2d

1) (1982).

12. Since the defendant's conviction on two counts of cruelty to children was supported by the evidence, see Division 7 (b), post, the jury was authorized to consider these offenses in aggravation. OCGA § 17-10-2.

13. The written instructions furnished by the court to the jury were sufficient. *Mulligan v. State*, 245 Ga. 266 (4) (264 SE2d 204) (1980).

14. The defendant did not object at trial to the state's attempt to impeach a witness, and the issue raised in his 16th enumeration of error has not been preserved for review. *Spencer v. State*, 260 Ga. 640 (7) (398 SE2d 179) (1990).

15. Neither did the defendant object to the state's closing argument. Absent fundamental unfairness, the issues raised in the defendant's 17th enumeration are not preserved for review. Id.; UAP, § IV (A) (3).

16. The trial court committed no abuse of discretion by denying the defendant's motion for a mistrial on the grounds of a deadlocked jury when the jury had been deliberating for only three hours. *Romine v. State*, 256 Ga. 521 (1) (350 SE2d 446) (1986).

17. As noted above, the evidence supports the jury's § b (7) finding. OCGA § 17-10-35 (c) (2). We do not find that Hall's death sentence was imposed as the result of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1). Hall's death sentence is neither excessive nor disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of a death sentence in this case.

*Judgment affirmed. All the Justices concur, except Weltner and Hunt, JJ., who concur specially as to Division 11; Bell, Benham and Fletcher, JJ., who dissent as to Division 11 and the death sentence; Weltner, Benham and Fletcher, JJ., who dissent as to Division 7 and the conviction on two counts of cruelty to children.*

## APPENDIX.

*Alderman v. State*, 254 Ga. 206 (327 SE2d 168) (1985); *Conner v. State*, 251 Ga. 113 (303 SE2d 266) (1983); *Smith v. State*, 249 Ga. 228 (290 SE2d 43) (1982); *Krier v. State*, 249 Ga. 80 (287 SE2d 531) (1982); *Cunningham v. State*, 248 Ga. 558 (284 SE2d 390) (1981); *Brown v. State*, 247 Ga. 298 (275 SE2d 52) (1981); *High v. State*, 247 Ga. 289 (276 SE2d 5) (1981); *Strickland v. State*, 247 Ga. 219 (275 SE2d 29) (1981); *Tyler v. State*, 247 Ga. 119 (274 SE2d 549) (1981); *Cape v. State*, 246 Ga. 520 (272 SE2d 487) (1980); *Thomas v. State*, 245 Ga. 688 (266 SE2d 499) (1980); *Hardy v. State*, 245 Ga. 272 (264

SE2d 209) (1980); *Hamilton v. State*, 244 Ga. 145 (259 SE2d 81) (1979); *Bowen v. State*, 244 Ga. 495 (260 SE2d 855) (1979); *Johnson v. State*, 242 Ga. 649 (250 SE2d 394) (1978); *Alderman v. State*, 241 Ga. 496 (246 SE2d 642) (1978); *Morgan v. State*, 241 Ga. 485 (246 SE2d 198) (1978); *Blake v. State*, 239 Ga. 292 (236 SE2d 637) (1977); *Dix v. State*, 238 Ga. 209 (232 SE2d 47) (1977); *Harris v. State*, 237 Ga. 718 (230 SE2d 1) (1976).

WELTNER, Justice, concurring specially.

I concur in affirming the imposition of the death penalty in this case, but on a basis differing from the majority.

1. OCGA § 17-10-30 (b) (7) defines as one of several "aggravating circumstances:" "the offense of murder . . . was outrageously or wantonly vile, horrible, *or* inhuman *in that* it involved torture, depravity of mind, *or* an aggravated battery to the victim. . . ." [Emphasis supplied.]

2. An analysis of the statute demonstrates the necessity for the fact finder to make two separate inquiries.

(a) The first inquiry concerns the existence of a factual element, i.e., whether or not the evidence establishes that the murder involved (1) torture, *or* (2) depravity of mind, *or* (3) an aggravated battery to the victim.

(b) The second inquiry (if the jury determines that the murder did involve at least one of these three factual elements) concerns the attributes of the murder, i.e, whether (by virtue of the existence of one or more of the three specified factual elements) the murder was (1) outrageously or wantonly vile, *or* (2) horrible, *or* (3) inhuman.

3. The majority and the dissent are at odds over whether or not the evidence was sufficient to establish "torture." That issue is not essential to the resolution of this case, however, in view of the jury's verdict.[1]

(a) The jury found *two* of the three possible factual elements and *three* of the attributes, as specified in OCGA § 17-10-30 (b) (7).

(b) Whether or not the factual circumstances in this case rise to "torture," a jury most assuredly might find that the murder by Hall of his minor son in the presence of his minor daughters, along with his conduct immediately following the murder, demonstrated "depravity of mind."[2]

I am authorized to state that Justice Hunt joins this special con-

---

[1] "We the jury find the following aggravating circumstances to exist beyond a reasonable doubt: wantonly vile, depravity of mind, horrible, inhuman in that it involved torture." Id. at p. 783.

[2] See *Conklin v. State*, 254 Ga. 558, 564-565 (331 SE2d 532) (1985). Compare *West v. State*, 252 Ga. 156, 161-162 and concurring opinion at 163 (313 SE2d 67). (1984). See also *Zant v. Stephens*, 250 Ga. 97, 100 (297 SE2d 1) (1982).

currence.

BENHAM, Justice, dissenting.

My review of this case has convinced me that the evidence adduced at trial was insufficient to support the imposition of the death penalty or to support appellant's convictions for cruelty to children. I must, therefore, respectfully dissent to Divisions 7 and 11 of the majority opinion and the judgment insofar as it affirms the death penalty and the convictions for cruelty to children.

1. The aggravating circumstance on which the State relied in seeking the death penalty was that found in OCGA § 17-10-30 (b) (7), that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involves torture, depravity of mind or an aggravated battery." The State conceded that no aggravated battery was involved, and the jury was only charged on the other two elements, torture and depravity of mind.

There is no question that appellant's conduct in this matter was abhorrent and is justly condemned. However, terrible as it was, the evidence in this case does not establish that his conduct was so "outrageously or wantonly vile, horrible or inhuman" as to distinguish this killing from "ordinary murders for which the penalty of death is not appropriate. . . ." *Hance v. State*, 245 Ga. 856 (3) (268 SE2d 339) (1980).

To illustrate the difference between this case and those in which the death penalty has been judged to be appropriate under § (b) (7), it is instructive to review the cases cited in the Appendix to the majority opinion. *Alderman v. State*, 254 Ga. 206 (327 SE2d 168) (1985), is a later appearance of *Alderman v. State*, 241 Ga. 496 (246 SE2d 642) (1978), also cited in the Appendix. There, the evidence showed that the defendant developed a scheme to kill his wife and to share the proceeds of her life insurance with another. After forcing his accomplice to strike the victim on the head with a large wrench, the defendant and the accomplice strangled the victim, then held her under water in the bathtub. In *Conner v. State*, 251 Ga. 113 (303 SE2d 266) (1983), the defendant chased the victim into a barbed wire fence, dragged the victim back to a ditch where he beat the victim with a whiskey bottle and a stick, then stomped the victim with his feet before leaving the victim lying in water in the ditch. The defendant in *Smith v. State*, 249 Ga. 228 (290 SE2d 43) (1982), stabbed the victim 17 times and hit him in the head with a hammer, after which the victim lived for almost a full day. This court took note in its review of the aggravating circumstances that this was not a domestic murder. The victim in *Krier v. State*, 249 Ga. 80 (287 SE2d 531) (1982), was subjected to a serious, vicious beating with a telephone receiver, then cut at least 12 times, producing near decapitation. This

court noted in *Cunningham v. State*, 248 Ga. 558 (284 SE2d 390) (1981), that the victim was not killed instantaneously, but was beaten with a large wrench, breaking both forearms and producing eight skull fractures. As in *Smith*, supra, it was noted that this was not a domestic murder. *Brown v. State*, 247 Ga. 298 (275 SE2d 52) (1981), and *High v. State*, 247 Ga. 289 (276 SE2d 5) (1981), were the appeals of two defendants in the same case. They kidnapped the young victim and his stepfather during a robbery, taunted the boy with his impending death on the way to the execution site, then forced him to lie on the ground next to his stepfather, where both victims were killed. This court took note of the deliberate and prolonged psychological torture to which the boy was subjected during the drive. The murder for which the defendant in *Strickland v. State*, 247 Ga. 219 (275 SE2d 29) (1981), was sentenced to death was one of three killings in a single shooting spree. The defendant killed three members of his former girl friend's family, wounded two others, and shot his former girl friend 12 times in an apparent attempt to render her unattractive to others. In the first killing in the spree, the defendant shot the former girl friend's sister in the face four or five times with hollow point bullets, making the crime gruesome in order to punish his former girl friend. In *Tyler v. State*, 247 Ga. 119 (274 SE2d 549) (1981), the defendant killed her husband by poisoning him with rat poison containing the chemical parathion. The actual killing was the culmination of a month-long effort in which the defendant caused the victim agonizing pain in the course of three poisonings. The victim in *Cape v. State*, 246 Ga. 520 (272 SE2d 487) (1980), was a 15-year-old female whose body showed signs of serious sexual abuse and exhibited multiple skull fractures from a beating with an iron pipe. This court noted again that this was not a domestic murder. "[T]orture of the most sadistic kind . . ." was this court's characterization of the brutal strangulation of a nine-year-old boy in *Thomas v. State*, 245 Ga. 688 (266 SE2d 499) (1980). Evidence of blood on the front of the defendant's pants on the day of the murder, coupled with his prior record of child molestation and the fact that the victim's pants had been pulled down, suggested that the victim was also subjected to a violent sexual assault. The evidence in *Hardy v. State*, 245 Ga. 272 (264 SE2d 209) (1980), showed that the victim was beaten, partially disrobed, cut with a knife, and threatened with immolation in an effort to get him to reveal where his money was kept. After that torture, the victim was methodically executed. The rape of a 13-year-old girl and her subsequent killing by means of multiple stabbings was found to satisfy the aggravating circumstance in *Bowen v. State*, 244 Ga. 495 (260 SE2d 855) (1979). The victim in *Hamilton v. State*, 244 Ga. 145 (259 SE2d 81) (1979), was beaten with a blunt object, then stabbed four times, three times in the head and once in the heart. In *Johnson v. State*,

242 Ga. 649 (250 SE2d 394) (1978), the defendant committed an execution-style killing of a young woman whom he had abducted at gunpoint, bound, disrobed, and raped. The defendant in *Morgan v. State*, 241 Ga. 485 (246 SE2d 198) (1978), also kidnapped the victim at gunpoint, then transported him to a deserted spot in the trunk of a car, robbed him, blindfolded him, and then killed him with a shotgun blast to his face. After an argument with his girl friend, the defendant in *Blake v. State*, 239 Ga. 292 (236 SE2d 637) (1977), went to the girl friend's house and abducted the girl friend's two-year-old daughter. For revenge against the child's mother, the defendant took her to a bridge and dropped her from a place 100 feet above water, causing "severe mechanical trauma . . . and damage to the internal organs," and killing the child. The evidence in *Dix v. State*, 238 Ga. 209 (232 SE2d 47) (1977), showed that the victim was struck in the face with a blunt instrument, had her mouth taped shut, was tortured with one or more knives, receiving at least 11 cuts, and was then strangled with such force as to cause facial hemorrhaging. Finally, the defendant in *Harris v. State*, 237 Ga. 718 (230 SE2d 1) (1976), abducted a stranger, forced her at gunpoint to drive to a relatively private part of the shopping center parking lot where he abducted her, then put a coat over her head and shot her twice, all because she reminded him of his stepmother whom he hated.

The cited cases demonstrate a commonality of horror, a sustained brutality or complete indifference to the pain and even the lives of others, without even the motivating force of anger to explain, though not excuse, the cruelty of the defendants' conduct. The present case does not belong in that company. What the evidence in this case shows is that the defendant, after consuming alcohol for an extended period of time, became angered at what he perceived as his son's disobedience, took up his shotgun, walked up to the boy and, without a further word, fired a single fatal shot. By contrast with the cited cases, there was no torture, either physical or mental, over an extended period, no mutilation, no sexual abuse. There was, as has become woefully common, only an angry domestic confrontation ending in a fatal shooting.

Recognizing that the § (b) (7) aggravating circumstance might be abused, this court cautioned in *Harris v. State*, 237 Ga. at 732, that it had

> no intention of permitting this statutory aggravating circumstance to become a "catch all" for cases simply because no other statutory aggravating circumstance is raised by the evidence.

In the present case, the jury indicated that it had found the nec-

essary components of torture and depravity of mind. Those elements were also found by the fact finder in *Phillips v. State*, 250 Ga. 336 (297 SE2d 217) (1982), but this court found the evidence there insufficient to support those findings. There, as here, there were none of the elements of serious physical, sexual or psychological abuse before death which establish torture, and there was no evidence in either case that the victim was "subjected to serious psychological abuse before death, or to mutilation, serious disfigurement, or sexual abuse after death" (id.) which would establish depravity of mind. The court rejected the notion that pain and the anticipation of death alone constitute

> serious physical and psychological abuse before death. Such an interpretation of § (b) (7) would allow the trier of fact to find § (b) (7) in almost every murder case. We cannot so broadly construe "physical" or "psychological" abuse. [Id.]

This court clearly held in *Phillips* that the mere apprehension of death, immediately before the fatal wound is inflicted, does not amount to serious psychological abuse before death, and that shooting alone, even multiple shots, is not sufficient to show torture. In concluding the sentence review in *Phillips*, this court made an observation equally applicable to the present case:

> The evidence in this case is undeniably sufficient to demonstrate that a murder was committed. For this heinous offense, [Hall] must be punished. [I] cannot agree, however, that this murder was "outrageously and wantonly vile, horrible and inhuman in that it involved torture to the victim and depravity of mind on the part of the defendant." [Id. at 342.]

Also applicable to this case is the following observation from my dissent in *Wade v. State*, 261 Ga. 105, 111 (401 SE2d 701) (1991):

> A life has been taken. When such a loss has resulted from a criminal act, society is justifiably outraged, and when the death involves one of tender years, society's outrage is magnified. In affirming the conviction of a defendant charged with a death-producing act, this court reaffirms society's outrage. However, our obligation as a court goes beyond expressing outrage. Our duty also imposes upon us an obligation to assure that the substantive rules of law and of criminal procedure are observed. It is in pursuit of that duty that I must respectfully dissent to the [affirmance of the death penalty in the] majority opinion.

2. Appellant's conviction for cruelty to children was based solely on the fact that his two daughters were present and saw him murder his son. It is apparent, therefore, that the applicable part of the definition of the offense is in subsection (b) of OCGA § 16-5-70: "Any person commits the offense of cruelty to children when he maliciously causes a child under the age of 18 cruel or excessive physical or mental pain." There being no issue of physical pain in this case, we need be concerned only with evidence of mental pain. Neither of the children nor appellant's wife testified concerning any pain suffered by the murder victim's sisters. The only witnesses on the issue, as noted by the majority, were two social workers. One of those witnesses, who saw the children three days after their brother's death, testified that they exhibited no signs of trauma resulting from the violence in their home. That witness, and another social worker who never interviewed the children at all, testified that many children who have witnessed such events exhibit no signs of trauma immediately, but it may emerge years later. They did not testify, however, that these children suffered pain or that they would certainly do so in the future. As the majority notes, the testimony of these witnesses was not offered to establish that the two children had suffered cruel and excessive mental pain, but to counter an expected defense strategy. The only evidence, then, which was pertinent to the alleged suffering of those children from the conduct of their father was the defense testimony that the children showed great affection to their father at their brother's funeral.

The majority's holding in this case sets a dangerous precedent. It stands for the proposition that violent crime committed in the presence of a child constitutes cruel treatment of that child even if the conduct involved is in no way aimed at that child. It is apparent from the language of the statute that the legislature intended to protect children from cruel conduct directed at them. The conduct in this case was not directed at appellant's daughters; they were not victims but bystanders.

The majority's interpretation of OCGA § 16-5-70 (b) in this case is overbroad. The statute was not enacted for the protection of witnesses to crime, but for the protection of victims. While appellant's conduct was itself abhorrent, and was exacerbated by his indifference to the possible impact of that conduct on others than the murder victim, the fact that the conduct occurred in the presence of children did not constitute a separate crime. I must, therefore, dissent also to the affirmance of appellant's convictions for cruelty to children.

I am authorized to state that Justice Fletcher joins in this dissent, and that Justice Bell joins in Division 1 of this dissent.

DECIDED DECEMBER 3, 1991 —
RECONSIDERATION DENIED DECEMBER 18, 1991.

*Larry L. Duttweiler, Melodie L. Snell, Charlotta Norby,* for appellant.

*Timothy G. Madison, District Attorney, Jeffery G. Morrow, Assistant District Attorney, Michael J. Bowers, Attorney General, C. A. Benjamin Woolf, Staff Attorney,* for appellee.