A03A1252. APPLEBROOK COUNTRY DAYSCHOOL, INC.
v. THURMAN et al.
(591 SE2d 406)

RUFFIN, Presiding Judge.

Leslie and Garry Thurman sued Applebrook Country Dayschool, Inc. ("Applebrook"), a child day care center, to recover for the alleged wrongful death of their infant son, Garrison. The case proceeded to trial, and the jury returned a verdict for the Thurmans. Applebrook appeals, arguing that the trial court erred in admitting expert testimony. We agree and, therefore, reverse.

Evidence introduced at trial shows that the Thurmans placed their son at Applebrook when Mrs. Thurman returned to work in January 1996. On February 8, 1996, Garry Thurman took Garrison, who was then eight weeks old, to the day care center around 8:00 a.m. According to Lori Queen, a caregiver in Applebrook's infant room, Garrison did not appear sick or unusually cranky that morning, and his appetite was normal.

At approximately 1:15 p.m., Queen placed Garrison in a crib on his stomach for a nap. When Kathy Davis, another caregiver, noticed him stirring at 2:05 p.m., she patted him on his back, and Garrison "settled right down." At 2:25 p.m., however, caregiver Jackie Stone checked on Garrison and noticed that his hand was very pale. Stone turned him over and saw a small amount of blood coming from his nose. She called for help and then started CPR. The Applebrook staff continued to administer CPR until an ambulance arrived at around 2:45 p.m.

Garrison arrived at the hospital in cardiac arrest. Although emergency room workers resuscitated him, he died the next day. Garrison's treating physician testified that, in his opinion, Garrison was not breathing for approximately 20 minutes before his heart stopped. The autopsy report lists the cause of death as bronchiolitis.

The Thurmans subsequently sued Applebrook, alleging that the day care center failed to properly supervise Garrison. According to the Thurmans, no one at the day care center "checked on Garrison for an extended period of time when he was not breathing," resulting in his death. The jury agreed and awarded the Thurmans $1,000,000 in damages.

1. Applebrook first claims that the trial court erred in allowing Dr. Linda Miller, the Thurmans' expert in the field of infant supervision, to testify regarding the standard of care applicable to Apple-

brook and Applebrook's alleged breach of that standard. According to Applebrook, these opinions were "within the 'ken of the average layman'" and thus not proper subjects for expert testimony.

The trial court permitted Dr. Miller to testify, over objection, that the standard of care for supervision in a day care setting "is that a teacher is aware and can visually supervise the children in the room." The Thurmans' counsel further asked whether Applebrook breached the standard of care by placing Garrison to sleep on his stomach. Dr. Miller replied: "[s]ince 1992, and even earlier than that, there have been articles and public campaigns . . . to get both parents and teachers to put babies to sleep on their backs." She also testified that, since 1994, the well-settled standard of care in the day care industry requires that infants be placed on their backs to sleep.

As noted by Applebrook, "[t]he duty of a child care provider is to exercise reasonable care for the safety of the child gauged by the standard of the average reasonable parent."[1] Thus, "[t]he standard of care is that of the average parent."[2] Citing this standard, Applebrook argues that the average juror is competent to determine whether a caregiver's conduct breaches the applicable standard of care. In Applebrook's view, therefore, Dr. Miller's expert testimony relating to the standard of care and alleged breach was unnecessary. It further claims that Dr. Miller set forth a legal standard of care contrary to that established by our courts.

The admissibility of expert testimony is a matter within the trial court's sound discretion.[3] We will not reverse the trial court's ruling on such evidence absent an abuse of that discretion.[4] Nevertheless, the rules governing expert testimony are clear:

> Expert opinion testimony on issues to be decided by the jury, even the ultimate issue, is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman. However, it is equally clear that the scope of what is admissible as expert opinion testimony is not unlimited. It is the established rule in Georgia, that where (a) the path from evidence to conclusion is not shrouded in the mystery of professional skill or knowledge, and (b) the conclusion determines the ultimate issues of fact in a case, the jury must make the journey from evidence to

---

[1] (Punctuation omitted.) *Persinger v. Step By Step Infant Dev. Center*, 253 Ga. App. 768, 769 (560 SE2d 333) (2002).

[2] *La Petite Academy v. Turner*, 247 Ga. App. 360, 361 (1) (543 SE2d 393) (2000).

[3] See *Carlock v. Kmart Corp.*, 227 Ga. App. 356, 361 (3) (b) (489 SE2d 99) (1997).

[4] See id.

conclusion without the aid of expert testimony. A party may not bolster his case as to the ultimate issue with expert testimony when the jury could reach the same conclusion independently of the opinion of others.[5]

Whether Applebrook breached the standard of care owed Garrison certainly goes to the ultimate issue in this wrongful death case. And we agree with Applebrook that this particular question is not hidden in the mystical confines of professional skill or knowledge.[6] Applebrook's conduct should be viewed from the perspective of a reasonable parent. Although that determination may not be easy for jurors, they are capable of reaching a decision without an expert's opinion on the ultimate issue.[7]

Furthermore, and perhaps more importantly, Dr. Miller defined the standard of care in terms of standard practices in the day care industry. The legal standard of care, however, revolves around the conduct of an average parent — not the average day care center or day care worker.[8] Her testimony, therefore, misstates the law, potentially creating confusion for jurors.[9] Under these circumstances, her opinions about the standard of care and breach were not helpful to the jury.[10] And given the relationship between these opinions and the ultimate issue in the case, we cannot deem the error harmless.[11]

On appeal, the Thurmans contend that they were entitled to present evidence, through Dr. Miller, regarding rules, regulations, and practices governing operations at Applebrook. They also note that Applebrook introduced at trial the deposition testimony of its own expert, who testified about recommendations regarding infant sleep positions from the American Association of Pediatrics. According to the Thurmans, Applebrook cannot complain about Dr. Miller's

---

[5] (Punctuation omitted.) Id.

[6] See id.

[7] See id. at 361-362 (trial court properly excluded expert testimony on issue of whether criminal act was foreseeable to defendant); *Warnke v. Pace Membership Warehouse*, 215 Ga. App. 33, 34 (449 SE2d 629) (1994) (expert's testimony that curb height was "inherently dangerous" did not create an issue of fact in premises liability case because "the conclusion drawn by the expert [was] not one which is beyond the ken of the average layman").

[8] See *La Petite Academy*, supra.

[9] See *Ball v. Bright Horizons Children Center*, 260 Ga. App. 158, 163-164 (578 SE2d 923) (2003) (physical precedent only) (expert's testimony regarding day care worker's alleged negligent supervision misstated Georgia law and thus failed to create an issue of fact on summary judgment).

[10] See *Hall v. State*, 261 Ga. 778, 782 (7) (a) (415 SE2d 158) (1991) ("Expert testimony is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves and where such testimony would be helpful or necessary to assist the jury.").

[11] See *Jordan v. Ga. Power Co.*, 219 Ga. App. 690, 694 (1) (466 SE2d 601) (1995) (error in admitting improper expert testimony regarding causation not harmless).

similar testimony. Finally, they argue that Applebrook waived any alleged error by cross-examining Dr. Miller about her opinions on proper infant supervision.

Applebrook, however, does not challenge the admissibility of Dr. Miller's entire testimony. In fact, it asserts that the trial court properly allowed her to testify regarding industry practices, medical recommendations, and industry standards. It argues only that Dr. Miller should not have been permitted to define the *legal* standard of care governing this negligence action or testify about Applebrook's alleged breach of that standard. These opinions, Applebrook contends, exceeded the scope of proper expert testimony and invaded the province of the jury.

We agree. Although portions of Dr. Miller's testimony — including her discussion of sleep positioning — were unchallenged and thus properly admitted, the trial court allowed her to go too far in her testimony. Over Applebrook's objection, the trial court permitted Dr. Miller to testify about the standard of care, *mischaracterize* that standard, and assert, in essence, that Applebrook breached the standard. Such testimony was neither helpful nor necessary. On the contrary, it potentially confused the jury as to the appropriate standard of care in this case.

We recognize that the trial court later charged the jury on the "average parent" standard of care. Given the unique role that expert testimony plays in our courts, however, we cannot find that this jury charge cured the harm caused by Dr. Miller's inappropriate testimony. Accordingly, we must reverse and remand for a new trial.[12]

2. Applebrook also argues that the trial court erred in admitting Garry Thurman's expert testimony regarding Garrison's potential future earning capacity. Because this issue may arise on retrial, we will address it here.

Applebrook concedes that Mr. Thurman, a licensed insurance agent, was qualified to give expert testimony in the field of invest-

---

[12] The foreign jurisdiction cases cited by the Thurmans do not persuade us otherwise. We note that several do not address the narrow questions at issue here – whether an expert may define the legal standard of care applicable to a day care setting and testify regarding breach of that standard. See, e.g., *Drueding v. St. Paul Fire &c. Ins. Co.*, 482 S2d 83, 85-86 (La. App. 1986) (expert testimony admitted as to whether Frisbee game was dangerous under circumstances of case); *Stewart v. Zurich Ins. Co.*, 342 S2d 1273, 1274 (La. App. 1977) (expert should have been permitted to testify about appropriateness of playground equipment and supervision generally needed to prevent injuries). And at least one involves analysis of a standard of care different from that imposed in Georgia. See *Estate of LePage v. Horne*, 262 Conn. 116, 126 (809 A2d 505) (2002) (expert testimony needed to help the jury "determine the required standard of care – in this case, knowledge that the risk of [Sudden Infant Death Syndrome] associated with leaving an infant sleeping in the prone position is sufficiently great so as to make it reasonably foreseeable that SIDS may occur, thereby requiring the caretaker to take appropriate preventative measures").

ment insurance. It objected, however, to his testimony on Garrison's lost future earnings, asserting that such testimony exceeded the scope of his expertise. According to Applebrook, Mr. Thurman lacked any expertise in forecasting an individual's earning potential.

An expert need not have formal training or education in his area of expertise.[13] Instead, he may acquire the necessary expert qualifications "through skill and experience."[14] As we have found,

> [t]he requirements for qualification as an expert witness are minimal; generally, nothing more is required to qualify an expert than evidence that the person has been educated in a particular trade, science, or profession. . . . It is the possession of special knowledge derived either from experience, study, or both in a field of expertise that makes one an "expert."[15]

Mr. Thurman testified that, in his capacity as an insurance agent, he predicts his clients' future income. He further stated that, when making these calculations, he uses various wage inflation charts and considers factors such as income level, the type of job the client has, and the client's work-life expectancy. Given Mr. Thurman's experience in calculating long-term income, we cannot find that the trial court abused its discretion in concluding that he met the minimal requirements for expert qualification.

3. Finally, Applebrook argues that, because Mr. Thurman was not qualified to testify as an expert, the trial court erred in admitting into evidence the documents on which he relied for his opinions. As found in Division 2, however, the trial court did not err in admitting Mr. Thurman's expert testimony. This claim of error, therefore, lacks merit.

*Judgment reversed and case remanded for a new trial. Smith, C. J., and Miller, J., concur specially.*

SMITH, Chief Judge, concurring specially.

I concur with the result reached by the majority. I write separately to point out what I believe to be a distinction between expert testimony properly admitted to instruct a jury on controversial or emerging issues, in contrast to improperly admitted expert opinion testimony that invades the province of the jury.

Under the circumstances of this case, average jurors may not have had knowledge of the current theories concerning infant sleep

---

[13] See *In the Interest of C. W. D.*, 232 Ga. App. 200, 206 (3) (a) (501 SE2d 232) (1998).
[14] Id.
[15] (Citations omitted.) Id.

positioning. The infant was put to sleep on his stomach, a practice that has been the subject of extensive expert debate in this country over the past decade. I am not convinced that such knowledge can be characterized as commonplace. Although *Estate of LePage v. Horne*, 262 Conn. 116 (809 A2d 505) (2002), is not binding and addresses a different cause of death, Sudden Infant Death Syndrome (SIDS), I find that case instructive on the issue of the necessity of expert testimony in certain situations. In discussing the dangers of allowing infants to sleep on their stomachs and the increased risk of SIDS associated with this position, the Connecticut Supreme Court stated that information concerning sleep positioning as it related to SIDS "only began to be disseminated to the public in 1994" and that "[i]ndeed, prior to 1992, parents in the United States predominantly placed infants to sleep in the prone position. *It is likely that many jurors who did their childrearing prior to this time would not know of the risks associated with the prone sleep position.*" (Citation omitted; emphasis supplied.) Id. at 130-131.

I recognize that the cause of death in this case was not SIDS. Given the ongoing controversy about infant sleep positioning, however, I agree in principle with *LePage* that attending to a sleeping infant is not necessarily "a commonplace activity" about which the average juror would have knowledge enabling him or her to determine whether a child care provider breached the standard of care. Given the varying recommendations of the medical and child care professions concerning infant sleep positioning, I believe that expert testimony is necessary to assist even the "average reasonable parent" in understanding the risks associated with the prone position.

The expert in this case properly testified as to a number of facts, including the state regulations concerning child care and the movement in this country to educate individuals and institutions concerning proper infant sleep positioning. In this case, in which the standard of care is the "average parent," there is a difference, however, between expert testimony that provides a jury with information necessary to an informed verdict and the opinion of an expert that a defendant breached the standard of care. The former instructs the jury, while the latter is a matter for jury determination.

Although a portion of the expert's testimony was permissible, its scope was overbroad. In addition to misstating the standard of care, she repeatedly testified that the defendant breached that improperly defined standard of care. A great likelihood exists that the jury was confused and based its verdict on the misinformation and improper opinion testimony provided by the expert. Although the result seems harsh, I am consequently constrained to agree that reversal is required in this troubling case.

I am authorized to state that Judge Miller joins in this special concurrence.

DECIDED NOVEMBER 19, 2003 —
RECONSIDERATION DENIED DECEMBER 8, 2003 — 

*Downey & Cleveland, Joseph C. Parker, Hicks, Casey & Barber, William T. Casey, Jr., Christopher A. Townley*, for appellant.
*Renzo S. Wiggins*, for appellees.