## S04G0690. THURMAN et al. v. APPLEBROOK COUNTRY DAYSCHOOL, INC.
### (604 SE2d 832)

THOMPSON, Justice.

We granted a writ of certiorari to the Court of Appeals in *Applebrook Country Dayschool v. Thurman*, 264 Ga. App. 591 (591 SE2d 406) (2003), and posed this question: Is expert testimony regarding infant sleep positioning admissible in a childcare supervision case and, if so, for what purpose?

Leslie and Garry Thurman's son, Garrison, an eight-week-old infant, died in the care of Applebrook Country Dayschool. The evidence demonstrated that Lori Queen, a caregiver in Applebrook's infant room, placed Garrison in a crib on his stomach for a nap. Sometime later, another caregiver observed Garrison stirring; she patted him on his back and he "settled right down." After 20 minutes, a third caregiver, Jackie Stone noticed that Garrison's hand was pale. When she turned Garrison over, she saw a small amount of blood coming from his nose. She summoned help and administered CPR. Applebrook's staff continued to administer CPR until an ambulance came to take Garrison to a hospital. When he arrived at the hospital, Garrison was in cardiac arrest. Although he was revived, he died the next day.

The Thurmans brought suit against Applebrook, alleging negligent child care supervision. At trial, Dr. Linda Miller, an expert in the field of child supervision, testified that the standard of care for supervision in a daycare setting "is that a teacher is aware and can visually supervise the children in the room." In this regard, she averred that teachers can monitor sleeping infants better when they are placed on their backs. She also testified that since 1994, the well-settled standard of care in the daycare industry requires that infants be placed on their backs to sleep. Asked if Applebrook breached the standard of care by placing Garrison on his stomach, Dr. Miller replied: "Since 1992, and even earlier than that, there have been articles and public campaigns . . . to get both parents and teachers to put babies to sleep on their backs."

The jury awarded the Thurmans damages in the amount of $1,000,000. Applebrook appealed and the Court of Appeals reversed.

Asserting that the standard of care in a case of this kind "is that of the average parent," *La Petite Academy v. Turner*, 247 Ga. App. 360, 361 (543 SE2d 393) (2000), Presiding Judge Ruffin ruled that Dr. Miller's "opinions about the standard of care and breach were not helpful to the jury. And given the relationship between these opinions and the ultimate issue in the case, we cannot deem the error harmless." (Footnote omitted.) *Applebrook*, supra at 593. In this regard,

the Presiding Judge ruled that Dr. Miller's opinion — that Applebrook breached the standard of care — "goes to the ultimate issue in this wrongful death case." He added,

> [W]e agree with Applebrook that this particular question is not hidden in the mystical confines of professional skill or knowledge. Applebrook's conduct should be viewed from the perspective of a reasonable parent. Although that determination may not be easy for jurors, they are capable of reaching a decision without an expert's opinion on the ultimate issue.

(Footnote omitted.) Id.

Chief Judge Smith concurred specially in an opinion joined by Judge Miller. The Chief Judge agreed that Dr. Miller misstated the standard of care and that she improperly testified that Applebrook breached that standard. However, the Chief Judge disagreed with Presiding Judge Ruffin concerning Dr. Miller's theories about infant sleep positioning. In this respect, the Chief Judge opined:

> The infant was put to sleep on his stomach, a practice that has been the subject of extensive expert debate in this country over the past decade. I am not convinced that such knowledge can be characterized as commonplace. Although *Estate of LePage v. Horne*, 262 Conn. 116 (809 A2d 505) (2002), is not binding and addresses a different cause of death . . . I find that case instructive on the issue of the necessity of expert testimony in certain situations. In discussing the dangers of allowing infants to sleep on their stomachs and the increased risk of SIDS associated with this position, the Connecticut Supreme Court stated that information concerning sleep positioning as it related to SIDS "only began to be disseminated to the public in 1994" and that "(i)ndeed, prior to 1992, parents in the United States predominantly placed infants to sleep in the prone position. *It is likely that many jurors who did their childrearing prior to this time would not know of the risks associated with the prone sleep position.*" . . .
>
> I recognize that the cause of death in this case was not SIDS. Given the ongoing controversy about infant sleep positioning, however, I agree in principle with *LePage* that attending to a sleeping infant is not necessarily "a commonplace activity" about which the average juror would have knowledge enabling him or her to determine whether a child care

provider breached the standard of care. Given the varying recommendations of the medical and child care professions concerning infant sleep positioning, I believe that expert testimony is necessary to assist even the "average reasonable parent" in understanding the risks associated with the prone position.

*Applebrook*, supra at 596.

1. In *La Petite Academy v. Turner*, supra, the Court of Appeals boiled down the standard of care in a negligent childcare supervision case to "that of the average parent." Looking to *La Petite* and other cases, the appellate court employed that standard in this case and erroneously concluded that the testimony of Dr. Miller misstated the law and engendered confusion.

Although the applicable standard of care in a case of this kind may be said to *encompass* "that of the average parent," to say it is *only* that of an average parent is an oversimplification. As it is said:

> [T]he measure of duty of a person undertaking control and supervision of a child to exercise reasonable care for the safety of the child is to be gauged by the standard of the average *responsible* parent; such person is not an insurer of the safety of the child and has no duty to foresee and guard against every possible hazard. [Cit.] The measure of precaution which must be taken by one having a child in his care, who stands in no relation to the child except that he has undertaken to care for it, is that care which a *prudent person* would exercise *under like circumstances.* [Cit.] As a general rule, a person who undertakes the control and supervision of a child, even without compensation, has the duty to use reasonable care to protect the child from injury. Such person is not an insurer of the safety of the child. He is required only to use *reasonable care commensurate with the reasonably foreseeable risk of harm.* [Cit.]

(Punctuation omitted; emphasis supplied.) *Laite v. Baxter*, 126 Ga. App. 743, 745-746 (191 SE2d 531) (1972). See also *Wallace v. Boys Club of Albany*, 211 Ga. App. 534, 535 (439 SE2d 746) (1993).

Thus, as in every negligence case, the standard of care in a negligent childcare supervision case is that of a reasonably prudent person under like circumstances. *Wallace*, supra; *Laite*, supra. See also *Armor Elevator Co. v. Hinton*, 213 Ga. App. 27 (1) (443 SE2d 670) (1994); *Seaboard Coast Line R. Co. v. Mitcham*, 127 Ga. App. 102 (192 SE2d 549) (1972). That being so, it cannot be said that Dr. Miller's testimony misled or confused the jury with regard to the standard of

care. The question for decision was whether Applebrook exercised the measure of caution which a reasonably prudent person would have exercised *in the same or similar circumstances*. Dr. Miller's testimony shed light on that question. See *Wallace*, supra (the duty imposed on a childcare provider includes not only the general legal duty to exercise reasonable care under the circumstances but also the duty arising from the childcare provider's policies).

2. Dr. Miller's testimony about infant sleep positioning did not invade the province of the jury. At no point in her testimony did Dr. Miller state that Applebrook breached the standard of care. When asked directly whether the standard of care was breached, Dr. Miller did not answer the question. She merely reiterated what the standard was: "Since 1992, and even earlier than that, there have been articles and public campaigns . . . to get both parents and teachers to put babies to sleep on their backs."

Even if it can be said that Dr. Miller rendered an opinion on the ultimate issue in the case, we would find no error because "expert opinion testimony, even on the ultimate issue to be decided by the jury, is admissible if the expert's conclusion is beyond the ken of the average layperson." *Turtle v. State*, 271 Ga. 440, 443 (2) (520 SE2d 211) (1999). In this regard, we find the opinion of Chief Judge Smith and the Supreme Court of Connecticut persuasive. Given the latest controversies and theories surrounding infant sleep positioning, attending to a sleeping infant is not something that is within the ken of the average prudent person under the circumstances of this case, i.e., when the sleeping infant is one of many in a daycare setting. See *Estate of LePage v. Horne*, supra.

3. We answer the question posed at the outset of this opinion in the affirmative: Expert testimony regarding infant sleep positioning is admissible in a negligent childcare supervision case to assist the jury in determining whether the childcare provider breached its duty of care. It follows that the trial court did not abuse its discretion in admitting the expert testimony of Dr. Miller. See *Foster v. State*, 273 Ga. 34 (2) (537 SE2d 659) (2000). The Court of Appeals erred in ruling otherwise.

*Judgment reversed. All the Justices concur.*

DECIDED NOVEMBER 8, 2004 —
RECONSIDERATION DENIED DECEMBER 9, 2004.

*Renzo Wiggins*, for appellants.

*Downey & Cleveland, Joseph C. Parker, Hicks, Casey & Barber, William T. Casey, Jr., Mark W. Wortham, Christopher A. Townley*, for appellee.