MARY KATRYN T. LEPAGE, ADMINISTRATRIX
(ESTATE OF SHELBY BROOKE LEPAGE),
ET AL. *v.* BARBARA HORNE
(SC 16599)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued September 26—officially released December 3, 2002

*Wesley W. Horton,* with whom were *Daniel J. Krisch, William J. Melley III* and, on the brief, *Trenton C. Haas* and *Michael R. Young,* legal interns, for the appellant (defendant).

*Gerald S. Sack,* with whom was *Nicole D. Dorman,* for the appellee (named plaintiff).

*Opinion*

KATZ, J. This appeal arises from the tragic death of a seventy-five day old infant of sudden infant death syndrome (SIDS) while under the care of her day care provider. The defendant, Barbara Horne, doing business as Barbara's Child Care (Barbara's), appeals from the judgment of the trial court[1], rendered after a jury trial, in favor of the plaintiff,[2] Mary Katryn T. LePage, as administratrix of the estate of her daughter, Shelby Brooke LePage (Shelby). The dispositive issue on appeal is whether the plaintiff was required to introduce expert testimony to establish the requisite standard of care for attending to a sleeping infant so as to prevent SIDS. We conclude that expert testimony was required

---

[1] The defendant appealed from the trial court's judgment to the Appellate Court. We then transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] The original complaint in this action included two counts in which the plaintiff's husband sought damages on behalf of the parties' minor son, Tyler LePage, for emotional distress and costs attributed thereto. Those counts subsequently were withdrawn. Accordingly, references herein to the plaintiff are to Mary Katryn T. LePage only.

in the present case. In the absence of any such testimony, we reverse the judgment of the trial court.

The jury reasonably could have found the following facts. Since 1990, the defendant has owned and operated Barbara's, a licensed home day care facility in the town of Bolton. On December 7, 1998, the first day that the plaintiff returned to work after Shelby's birth, the plaintiff and her husband brought Shelby and their four year old son, Tyler LePage, to Barbara's. Tyler had been attending Barbara's since 1996. In conversations with the defendant prior to Shelby's first day at Barbara's, the plaintiff had asked that the defendant put Shelby in her car seat or swing when Shelby went down for her nap, so she would be near the other children. The defendant put Shelby down to sleep in the swing that first day.

The following day, the defendant was caring for four other young children, in addition to Shelby and Tyler. At 1 p.m., the five older children, including Tyler, began their regular naptime in the childproof basement area of the defendant's house. At approximately 2 p.m., the defendant took Shelby up to the main level of the house to bottle feed her. Sometime between 2:30 p.m. and 2:45 p.m., the defendant put Shelby down for her nap in a portable crib located in a room adjacent to the kitchen on the main floor. The defendant placed Shelby in the crib on her side and left the room. Around 3 p.m., the defendant woke the other children from their naps, at which time Tyler asked to see Shelby. At 3:05 p.m., the defendant took Tyler upstairs to the room in which Shelby was sleeping. Shelby appeared to be sleeping comfortably, but then was sleeping on her stomach, with her head to the side.[3] The defendant decided not

---

[3] In her brief, the plaintiff asserts that the defendant *initially* had placed Shelby on her *stomach*. The only testimony with respect to this fact, however, was that of the defendant, who testified consistently that she initially had placed Shelby on her *side*. Because it is undisputed that Shelby was asleep on her stomach at 3:05 p.m., when the defendant brought Tyler to see his

to disturb Shelby's sleep by shifting her onto her side or back. The next time the defendant went to check on Shelby was at approximately 4 p.m.[4] When she entered the room, the defendant noticed that Shelby's head was turned face down and, upon picking Shelby up, found her limp and lifeless. The defendant immediately called 911 and began cardiopulmonary resuscitation. Emergency medical personnel arrived shortly thereafter and transported Shelby to Manchester Memorial Hospital, where she was pronounced dead. After investigations by the police and the department of children and families, and after an autopsy had been performed, the cause of death was determined to be SIDS.

The following additional facts and procedural history are relevant to our resolution of this appeal. The plaintiff filed an amended complaint alleging that the defendant's negligence had caused Shelby's death and seeking damages. The plaintiff alleged that the defendant had been negligent in that, inter alia: (1) "she knew or should have know[n] that, in 1992 and again in 1996, the American [Academy] of Pediatrics strongly recommended that infants not be placed in the prone position for sleep while unattended, due to the dangers of [SIDS],

sister, we conclude that it is irrelevant to our resolution of this appeal whether the defendant initially had placed Shelby on her stomach or side.

[4] There was conflicting evidence as to how many times, or whether, the defendant had checked on Shelby between 3:05 p.m., when she brought Tyler to see Shelby, and 4 p.m., when she discovered Shelby lifeless in the crib. The defendant testified that she had checked on Shelby twice between this time period, once at 3:20 p.m. and again twenty minutes later. The defendant's statement to the police indicated only that she had checked on Shelby at 3:05 p.m. and at 4 p.m. The defendant's statement to an investigator for the department of children and families indicated that the defendant had checked on Shelby perhaps once during that period. Finally, the plaintiff testified that the defendant had told her that one hour had lapsed between the times the defendant had checked on Shelby. Because we view the facts as the jury reasonably could have found them in support of its verdict, we presume that the defendant did not check on Shelby between 3:05 p.m. and 4 p.m.

yet she did so with . . . Shelby LePage"; (2) "she left . . . Shelby LePage unattended for an extended period of time when, in the exercise of due care, she should not have done so";[5] and (3) "while she observed . . . Shelby LePage on her stomach while sleeping, and knew of an association between sleeping in this position and SIDS, she failed to move Shelby LePage onto her back when she could and should have done so."

At trial, the plaintiff introduced the testimony of Herbert H. Scherzer, the director of the Sleep Disorders Laboratory at Saint Francis Hospital and Medical Center in Hartford, as an expert to prove the cause of Shelby's death.[6] Scherzer testified that he had reviewed medical studies from various countries, including the United States, which indicate that, although there are several risk factors that have been identified as associated with SIDS, the highest risk factor is sleeping in the prone position. In addition to citing those studies, Scherzer noted that, because of this increased risk, the American Academy of Pediatrics (Academy) had issued a recommendation in 1992 suggesting that infants be placed on their side or back for sleep. He stated that, although the occurrence of SIDS is a "rare event," studies indicate that the statistical risk of it occurring increases anywhere from twofold to twelvefold when the infant is sleeping in the prone position. On cross-examination,

---

[5] On appeal, neither of the parties has addressed the plaintiff's allegation that the defendant was negligent by leaving Shelby unattended possibly for as long as fifty-five minutes with respect to the issue of whether expert testimony was required to establish the standard of care. Accordingly, we limit our discussion to the issue of negligence as it pertains to the defendant's actions in leaving Shelby sleeping in the prone position.

[6] The defendant filed a pretrial motion to preclude Scherzer's testimony, contending that he was not qualified to testify on SIDS. After conducting a hearing to determine the admissibility of Scherzer's testimony pursuant to *State* v. *Porter*, 241 Conn. 57, 63–64, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), the trial court denied the defendant's motion. It is undisputed, however, that Scherzer testified only as to causation, and not as to any standard of care.

Scherzer conceded that the risk of SIDS exists even when an infant is placed on its side or back, albeit a lower risk than when the infant is placed on its stomach. He concluded, however, that it was "[h]ighly probable" that Shelby's sleep position caused her death.

On direct examination by the plaintiff's counsel, the defendant admitted that, at the time of Shelby's death, she was aware of the Academy's recommendation that infants be placed for sleep on their side or back. The defendant further admitted that she was aware that this recommendation was based on an association between an infant's sleep position and the risk of SIDS. The defendant testified that she initially had placed Shelby on her side, but that she did not think of SIDS when she subsequently checked on Shelby and saw her sleeping on her stomach.

At the close of the plaintiff's case, the defendant moved for a directed verdict, on the ground that the plaintiff had failed to introduce any evidence of a specific standard of care applicable to the defendant. The defendant further contended that the plaintiff was required to introduce expert testimony to establish that standard of care. The trial court concluded that, "as a matter of law, there is a duty of a day care provider to provide . . . a reasonably safe environment for [his or her] wards . . . that takes into consideration the age and abilities and experience of those children . . . ." With respect to the issue of whether expert testimony was required, the trial court concluded that the experience of caring for a child is "so pervasive and so commonplace that an ordinary juror can judge what the standard of care is as to what is reasonably safe for the activity of an infant." Accordingly, the trial court denied the defendant's motion for a directed verdict.

During the presentation of her case, the defendant introduced testimony by Ira Kanfer, the forensic pathol-

ogist who had performed the autopsy on Shelby. Kanfer testified that he had determined that Shelby had died of SIDS after ruling out all other medical causes. According to Kanfer, medical science does not know the cause of SIDS. He further testified that the fact that Shelby had been sleeping in the prone position was irrelevant to his diagnosis.

Thereafter, the jury returned a verdict in favor of the plaintiff, awarding $200,000 in economic damages and $600,000 in noneconomic damages. The defendant moved to set aside the verdict, claiming that the jury had found in the plaintiff's favor based on the breach of a duty by the defendant despite the absence of evidence of the requisite standard of care.[7] In its memorandum of decision addressing the defendant's motion, the trial court noted that knowledge of a dangerous condition could establish the scope of a duty of care and determined that the defendant was aware of the Academy's recommendations to place infants on their side or back for sleeping. The court concluded that "a reasonable day care provider, armed with the defendant's knowledge of the proper sleeping position to minimize the risk of SIDS, owes a duty of care to infants whose welfare has been entrusted to the provider to guard against placing babies to sleep on their stomachs and to restore them to [a] supine position should the provider discover that the child has rolled into the prone position." Accordingly, the trial court denied the defendant's motion to set aside the verdict. Thereafter, the trial court rendered judgment for the plaintiff in accordance with the jury's verdict.[8] This appeal followed.

---

[7] The defendant also claimed that the trial court improperly: (1) allowed Scherzer's testimony; (2) charged the jury by creating a heightened standard of care inapplicable to the present case; and (3) charged the jury on damages, specifically, in permitting the jury to award damages for the decedent's loss of earning capacity. At oral argument on the motion to set aside the verdict, the trial court denied the defendant's motion with respect to these claims.

[8] The trial court's judgment also included an award of $182,002.92 in prejudgment interest based on an offer of judgment by the plaintiff that the

On appeal, the defendant claims that the trial court improperly: (1) denied her motion to set aside the verdict based on the plaintiff's failure to present any expert testimony establishing the requisite standard of care;[9] (2) charged the jury that the defendant was required to exercise "very great care" if there existed a potential for a risk of death; and (3) permitted the testimony of Scherzer as the plaintiff's expert on causation. We agree with the defendant as to the first issue and, accordingly, do not reach her remaining claims.

We begin by setting forth the relevant parameters under our negligence jurisprudence. "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, and [second], if one is found, it is necessary to evaluate the scope of that duty." (Citations omitted; internal quotation marks omitted.) *Maffucci* v. *Royal Park Ltd. Partnership*, 243 Conn. 552, 566, 707 A.2d 15 (1998). The issue of whether a duty exists is a question of law; *Gomes* v. *Commercial Union Ins. Co.*, 258 Conn. 603, 614, 783 A.2d 462 (2001); *Petriello* v. *Kalman*, 215 Conn. 377, 382, 576 A.2d 474 (1990); which is subject to plenary review. We sometimes refer to the scope of that duty as the requisite standard of care. See, e.g., *Santopietro* v. *New Haven*, 239 Conn. 207, 226, 228–29, 682 A.2d 106 (1996); *Shore* v. *Stonington*, 187 Conn. 147, 151,

defendant did not accept. The trial court also determined that a deduction for collateral source payments did not apply in this case.

[9] The defendant has couched much of her argument on the issue of standard of care in terms of whether a negligence claim against the defendant, *in her professional capacity as a child care provider*, requires expert testimony. The plaintiff has not alleged, however, that the defendant's training or experience as a licensed day care provider provided her with particular knowledge giving rise to a special standard of care.

444 A.2d 1379 (1982); see also 57A Am. Jur. 2d, Negligence § 85 (1989).

"[O]ur threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. . . . By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" (Internal quotation marks omitted.) *Gomes* v. *Commercial Union Ins. Co.*, supra, 258 Conn. 615; *Jaworski* v. *Kiernan*, 241 Conn. 399, 405, 696 A.2d 332 (1997); see also 57A Am. Jur. 2d 216, supra, § 154 ("ordinary care has reference to probabilities of danger rather than possibilities of peril"). "The idea of risk in this context necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may possibly follow." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 31, p. 170; see also *Schiavone* v. *Falango*, 149 Conn. 293, 298, 179 A.2d 622 (1962) ("[r]easonable care does not require that one must guard against eventualities which, at best, are too remote to be reasonably foreseeable"). Accordingly, the fact finder must consider whether the defendant knew, or should have known, that the situation at hand "would obviously and naturally, even though not necessarily, expose [Shelby] to probable injury unless preventive measures were taken." *Bonczkiewicz* v. *Merberg Wrecking Corp.*, 148 Conn. 573, 579, 172 A.2d 917 (1961).

At oral argument in this court, the defendant acknowledged that she had a duty to provide a reasonably safe environment for children in her care, taking into consideration the age and abilities of those children. Cf. *Burns* v. *Board of Education*, 228 Conn. 640,

649, 638 A.2d 1 (1994) (school superintendent has duty to protect pupils in "[school] board's custody from dangers that may reasonably be anticipated"). The aspect of negligence on which the defendant's claim focuses, however, is the scope of that duty. The defendant contends expert testimony was required to establish the requisite standard of care because knowledge about the proper sleep position for an infant is beyond the knowledge and experience of the ordinary juror. The plaintiff contends that, to the contrary, because attending to a sleeping infant is a commonplace activity, no expert testimony is required to establish the requisite standard of care. We agree with the defendant.

"The requirement of expert testimony . . . serves to assist lay people, such as members of the jury and the presiding judge, to understand the applicable standard of care and to evaluate the defendant's actions in light of that standard." *Davis* v. *Margolis*, 215 Conn. 408, 416, 576 A.2d 489 (1990). Expert testimony is *required* "when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors." *Bader* v. *United Orthodox Synagogue*, 148 Conn. 449, 454, 172 A.2d 192 (1961); accord *Santopietro* v. *New Haven*, supra, 239 Conn. 226; *Fitzmaurice* v. *Flynn*, 167 Conn. 609, 617, 356 A.2d 887 (1975); *Decho* v. *Shutkin*, 144 Conn. 102, 106, 127 A.2d 618 (1956); *Jaffe* v. *State Dept. of Health*, 135 Conn. 339, 349–50, 64 A.2d 330 (1949).

The question in the present case, therefore, is not, as the plaintiff suggests, whether tending to sleeping infants is a common experience.[10] In order to find the

[10] Indeed, in *Santopietro* v. *New Haven*, supra, 239 Conn. 228–29, we concluded that the plaintiff was required to introduce evidence to prove the requisite standard of care that an umpire must use in managing players' unruly behavior to maintain control of a game so as to prevent an unreasonable risk of injury to others at an amateur softball game. We reached this conclusion despite the fact that it is not an uncommon experience for parents to umpire their children's softball games.

defendant negligent, the ordinary person would need to know, not only that leaving an infant sleeping in the prone position gives rise to a risk of SIDS, but also that this risk was appreciably greater than that associated with other sleep positions. See *Schiavone* v. *Falango*, supra, 149 Conn. 298. Accordingly, the question is whether the ordinary juror has sufficient knowledge to determine the required standard of care—in this case, knowledge that the risk of SIDS associated with leaving an infant sleeping in the prone position is sufficiently great so as to make it reasonably foreseeable that SIDS may occur, thereby requiring the caretaker to take appropriate preventative measures. We conclude that this question goes beyond the field of ordinary knowledge and experience of jurors and, therefore, that expert testimony was required.

Some background facts on SIDS inform our resolution of this issue. SIDS is defined as "[t]he sudden death of an infant under one year of age which remains unexplained after a thorough case investigation, including performance of a complete autopsy, examination of the death scene, and a review of the clinical history." M. Willinger, L. James & C. Catz, "Defining the Sudden Infant Death Syndrome (SIDS): Deliberations of an Expert Panel Convened by the National Institute of Child Health and Human Development," 11 Pediatric Pathology 677, 681 (1991); accord Stedman's Medical Dictionary (26th Ed. 1995) (defining SIDS as "abrupt and inexplicable death of an apparently healthy infant"). The syndrome is the primary cause of death of infants between the ages of one week and one year of age and occurs during sleep.[11] Principles and Practice

---

[11] "The incidence of SIDS peaks between 2 and 4 months of age. Approximately 90 [percent] of SIDS deaths occur before the age of 6 months." American Academy of Pediatrics: Committee on Child Abuse and Neglect, "Distinguishing Sudden Infant Death Syndrome From Child Abuse Fatalities," 107 Pediatrics 437 (February 2001).

of Sleep Medicine (3d Ed. 2000, M. Kryger, T. Roth & W. Dement eds.) c. 13, Medical and Neurological Disorders, R. Verrier & M. Mittleman, "Sleep-Related Cardiac Risk," p. 1006. In 1998, the year of Shelby's death, the national rate of SIDS in the United States was 0.64 per 1000 live births. M. Ackerman et al., "Postmortem Molecular Analysis of SCN5A Defects in Sudden Infant Death Syndrome," 286 JAMA 2264 (November 2001). That means that for every 100,000 live births, sixty-four would result in death from SIDS.

Approximately fifty years ago, medical professionals began research to determine the cause or causes of SIDS. American Academy of Pediatrics: Committee on Child Abuse and Neglect, "Distinguishing Sudden Infant Death Syndrome From Child Abuse Fatalities," 107 Pediatrics 437 (February 2001). Although "various theories have been advanced to explain such deaths (e.g., sleep-induced apnea, laryngospasm, overwhelming infectious disease) . . . none has been generally accepted or demonstrated at autopsy."[12] Stedman's Medical Dictionary, supra; see also American Academy of Pediatrics: Committee on Child Abuse and Neglect, supra, 107 Pediatrics 438 ("diagnosis of SIDS reflects the clear admission by medical professionals that an infant's death remains completely unexplained"); M. Ackerman et al., supra, 286 JAMA 2264 (citing various hypotheses regarding cause and noting that "pathophysiological mechanisms responsible for SIDS remain poorly understood"). Studies have, however, identified certain risk factors: "prone sleep position, sleeping on

---

[12] The debate continues about the etiology of SIDS. Recently, some researchers have focused on the possibility of genetic or physiological causes. See M. Ackerman et al., supra, 286 JAMA 2264 (suggesting genetic condition); American Academy of Pediatrics: Committee on Child Abuse and Neglect, supra, 107 Pediatrics 437 (noting various hypotheses relating to physiological factors); P. Schwartz et al., "Prolongation of the QT Interval and the Sudden Infant Death Syndrome," 338 New Eng. J. Med. 1709, 1709–14 (June 1998) (suggesting physiological factor).

a soft surface, maternal smoking during pregnancy, overheating, late or no prenatal care, young maternal age, prematurity and/or low birth weight, and male sex." American Academy of Pediatrics: Task Force on Infant Sleep Position and Sudden Infant Death Syndrome, "Changing Concepts of Sudden Infant Death Syndrome: Implications for Infant Sleeping Environment and Sleep Position," 105 Pediatrics 650 (March 2000). Sleeping in the prone position has been identified as one of the highest modifiable risk factors, with studies from various countries reflecting that, when a child is in that position, the odds of SIDS occurring range from 1.7 times more likely than if the infant were in the nonprone position, at the low end of the spectrum, to 12.9 times more likely, at the high end. Id.

In light of this emerging research, in 1992, the Academy issued the following recommendation: "Based on careful evaluation of existing data indicating an association between Sudden Infant Death Syndrome [SIDS] and prone sleeping position for infants, the Academy recommends that healthy infants, when being put down for sleep, be positioned on their side or back." American Academy of Pediatrics: Task Force on Infant Positioning and SIDS, "Positioning and SIDS," 89 Pediatrics 1120 (June 1992). At that time, in the United States, infants were being placed predominantly in the prone, or face down, sleep position, for a wide variety of reasons, including a perceived decrease in the likelihood of aspiration and less head molding. Id., 1124. The Academy found convincing the substantial evidence of a correlation between the incidence of SIDS and sleeping in the prone position.[13] Id., 1122. Moreover, it noted

---

[13] The Academy noted that the studies it had evaluated in making its recommendation did have some methodological limitations. In particular, it noted that the studies were conducted in countries in which cultural practices regarding infant care and certain SIDS risk factors varied from those in the United States. American Academy of Pediatrics: Task Force on Infant Positioning and SIDS, supra, 89 Pediatrics 1120.

that "no reports show an advantage to the prone position with regard to SIDS incidence and there are no data proving, or even strongly suggesting, that sleeping in the lateral [or on the side] or supine [or on the back] position is harmful to healthy infants. Thus, the assessment of the risk/benefit balance for prone [versus] nonprone positioning for such infants favors the latter." Id., 1124. The Academy cautioned, however, that for some infants, including preterm babies and those born with certain respiratory problems, prone sleeping may be the appropriate position. Id., 1125. Finally, the Academy noted that "[i]t should be stressed that, although the relative risk of the prone position may be several times that of the lateral or supine position, the actual risk of SIDS when placing an infant in a prone position is still extremely low." Id.

In 1994, a coalition of health groups began a nationwide "Back to Sleep" campaign, promoting awareness of the association between sleep position and SIDS, as well as various other factors, and a significant overall decrease in SIDS followed.[14] American Academy of Pediatrics: Task Force on Infant Positioning and SIDS, "Positioning and Sudden Infant Death Syndrome (SIDS): Update," 98 Pediatrics 1216, 1218 n.2; see American Academy of Pediatrics: Committee on Child Abuse and Neglect, supra, 107 Pediatrics 437; M. Ackerman et al., supra, 2264. In 1996, the Academy reevaluated the issue and continued to recommend that infants be placed in positions other than the prone sleep position, although it modified the recommendation to state a preference for the supine position over the side posi-

_____

[14] The campaign was initiated as a joint effort by the Academy, the United States Public Health Service, the SIDS Alliance, and the Association of SIDS and Infant Mortality Programs. American Academy of Pediatrics: Task Force on Infant Sleep Position and Sudden Infant Death Syndrome, supra, 105 Pediatrics 650. The effort included targeting child care educational programs, distributing information to hospital nurseries and physicians, and initiating public media campaigns. Id., 650–51.

tion. American Academy of Pediatrics: Task Force on Infant Positioning and SIDS, supra, 98 Pediatrics 1217–18. In a recent report on SIDS, the Academy noted that, despite its educational efforts, 20 percent of infants at the highest risk age group continued to be placed in the prone sleep position. American Academy of Pediatrics: Task Force on Infant Sleep Position and Sudden Infant Death Syndrome, supra, 105 Pediatrics 651. Moreover, studies have indicated that a significant number of licensed child care providers continue to be unaware of the association between SIDS and the prone sleep position and to place infants in that position.[15] Id.; R. Moon & W. Biliter, "Infant Sleep Position Policies in Licensed Child Care Centers After Back to Sleep Campaign," 106 Pediatrics 576, 579 (September 2000).

In light of these facts, we conclude that it simply is beyond the ken of an ordinary juror to understand the applicable standard of care in order to evaluate the defendant's actions in light of that standard—specifically, to know that there is a risk of SIDS associated with the prone sleep position and that the risk associated with this position is appreciably greater than that associated with other sleep positions. Information about SIDS and sleep position only began to be disseminated to the public in 1994, four years prior to Shelby's death. Indeed, prior to 1992, parents in the United States predominantly placed infants to sleep in the prone posi-

---

[15] One study indicated that in 1996, approximately 43 percent of licensed child day care providers in Washington, D.C. and the Maryland suburbs were unaware of the association between SIDS and the prone sleep position and that 49 percent of them placed infants to sleep in the prone position. R. Moon & W. Biliter, "Infant Sleep Position Policies in Licensed Child Care Centers After Back to Sleep Campaign," 106 Pediatrics 576, 579 (September 2000). In part due to these results, in 1999, the Back to Sleep campaign targeted mailings to those providers. Id. The study indicated that in 2000, almost one half of the licensed child care providers surveyed still were unaware of the associated risk, but that the percentage of infants placed in the prone sleep position nevertheless had decreased to approximately 28 percent. Id.

tion. American Academy of Pediatrics: Task Force on Infant Positioning and SIDS, supra, 89 Pediatrics 1124. It is likely that many jurors who did their childrearing prior to this time would not know of the risks associated with the prone sleep position. Moreover, even if the ordinary person were to have a general awareness of such risks, it is unlikely that he or she would know that, even when an infant is placed in the prone position, the overall risk of SIDS is still extremely low, even relative to other sleep positions.[16] Put another way, the pertinent question is whether the ordinary person would know that the likelihood of harm from placing an infant in the prone position is statistically significant enough so as to require a reasonable person to take measures to prevent the infant from sleeping prone. See *Bader* v. *United Orthodox Synagogue,* supra, 148 Conn. 454 ("[i]t is only when the conduct under investigation is manifestly contrary to that of a reasonably prudent person that it may be considered negligent as a matter of law"). Finally, we note the ongoing debate as to the cause of SIDS; see footnote 12 of this opinion; and warnings that the prone position is not appropriate in all circumstances easily could cause confusion as to what is reasonable behavior. Therefore, the ordinary

---

[16] We recognize that, with respect to the general issue of negligence, the likelihood of the harm must be considered in conjunction with the gravity of the harm that could ensue. See W. Prosser & W. Keeton, supra, p. 171 ("[I]f the risk is an appreciable one, and the possible consequences are serious, the question is not one of mathematical probability alone. . . . As the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution."). In the present case, the facts indicate that there would be some risk of harm regardless of the course of action taken by the defendant. The question of the likelihood of the harm in this specific context, therefore, is relative to the risk associated with the suggested course of conduct, specifically, placing the infant on its side or back to sleep. Accordingly, if the risk of SIDS in the nonprone position hypothetically were one in one million, and the risk in the prone position increased to two in one million, the relative nature of the risk would be essential to determining the foreseeability of the harm.

juror would not necessarily be aware of the appropriate course of conduct with respect to sleep position. Accordingly, we conclude that expert testimony was required to assist the jury "to understand the applicable standard of care and to evaluate the defendant's actions in light of that standard." *Davis* v. *Margolis*, supra, 215 Conn. 416.

The plaintiff contends that, even if the jury required evidence of specialized knowledge in order to determine the standard of care, she did not need to produce her own expert because the standard of care was proved through the defendant's testimony. The plaintiff points to the defendant's admissions that she knew of the Academy's recommendations to place infants on their side or back and that she knew that the recommendations were based on the risk of SIDS associated with the prone sleep position. We conclude that the defendant's testimony was not sufficient to allow the jury to determine the scope of the defendant's duty.

We previously have determined that a plaintiff may prove the standard of care through the testimony of a defendant. *Santopietro* v. *New Haven*, supra, 239 Conn. 229; *Console* v. *Nickou*, 156 Conn. 268, 273–74, 240 A.2d 895 (1968); *Snyder* v. *Pantaleo*, 143 Conn. 290, 294–95, 122 A.2d 21 (1956). Moreover, as an expert witness, the defendant is "not required specifically to have expressed an opinion that [she] breached the standard of care in order for the [plaintiff] to prevail. . . . Rather, the [plaintiff] need only have produced sufficient expert testimony to permit the jury reasonably to infer, on the basis of its findings of fact, that [the defendant] breached the standard of care." (Citations omitted.) *Santopietro* v. *New Haven*, supra, 229–30.

The defendant's testimony in the present case did not satisfy this standard. The defendant would have needed to provide to the jury facts from which it could

have determined that the risk of SIDS was foreseeable to the defendant, both because the infant was left in the prone position, and because that risk was appreciably greater than if the infant were on her side or back.[17] The defendant testified only that she was aware that the prone position was recommended because it is *associated* with a risk of SIDS.

Moreover, the defendant's knowledge of the risks of SIDS associated with sleep position was limited to a recommendation by the Academy. Although we have not addressed this issue previously, other jurisdictions routinely have found that, although recommendations may be offered to support expert testimony on the standard, they are not equivalent to a standard of care. See, e.g., *Muncie Aviation Corp.* v. *Party Doll Fleet, Inc.*, 519 F.2d 1178, 1180, 1183 n.10 (5th Cir. 1975); *United States ex rel. Mikes* v. *Straus*, 84 F. Sup. 2d 427, 433 (S.D.N.Y. 1999); *Kipp* v. *United States*, 880 F. Sup. 691, 695 (D. Neb. 1995), aff'd, 88 F.3d 681 (8th Cir. 1996); cf. *McComish* v. *DeSoi*, 42 N.J. 274, 282, 200 A.2d 116 (1964) (safety code inadequate to prove standard of care). Recommendations are merely a suggested course of conduct. See Black's Law Dictionary (6th Ed. 1990) (defining recommendation as "an action which is advisory in nature rather than one having any binding effect"). Indeed, the Academy's recommendation includes an express disclaimer that it is not intended to serve as a standard of care.[18]

---

[17] As we noted previously, Scherzer, the plaintiff's expert witness, did testify about the frequency of the occurrence of SIDS and the risk differential for the prone sleep position as compared to other positions. In the hearing on the defendant's motion to preclude Scherzer's testimony, the plaintiff expressly stated that his testimony was offered exclusively to prove causation, not the standard of care.

[18] The following statement appears to be a standard disclaimer appearing in each article published by the Academy: "The recommendations in this statement do not indicate an exclusive course of treatment or serve as a standard of medical care. Variations, taking into account individual circumstances, may be appropriate." American Academy of Pediatrics: Task Force on Infant Sleep Position and Sudden Infant Death Syndrome, supra, 105

In sum, the plaintiff might have been able to provide, through the defendant's testimony, the critical facts unknown to the ordinary juror to establish the required standard of care by which the jury would evaluate the defendant's conduct.[19] In the present case, however, the defendant stated only that she was aware of a risk associated between prone sleep position and SIDS, and that this awareness derived from the recommendation of the Academy. She never indicated *any* knowledge as to the likelihood of the risk or whether the risk associated with the prone position was appreciably greater than other positions. Accordingly, the defen-

Pediatrics 650; accord American Academy of Pediatrics: Task Force on Infant Positioning and SIDS, supra, 89 Pediatrics 1120.

[19] We note that, in the present case, evidence as to the standard of care is required because knowledge beyond the ordinary person's purview is at issue. Cf. *Santopietro* v. *New Haven*, supra, 239 Conn. 227 (specialized knowledge of amateur softball umpire); *Goodrich Oil Burner Mfg. Co.* v. *Cooke*, 126 Conn. 551, 553, 12 A.2d 833 (1940) (specialized knowledge of refrigeration plant engineer); *Monterose* v. *Cross*, 60 Conn. App. 655, 658, 760 A.2d 1013 (2000) (specialized knowledge of equipment rigger). Not every action alleging negligence against a child care provider, however, necessarily would require expert testimony to establish the applicable standard of care. That determination would depend, as in the present case, on whether the day care provider either has actual knowledge of the foreseeable risk of harm, or whether constructive knowledge of such a risk could be ascribed to the care provider. For example, at one end of the spectrum, constructive knowledge could be ascribed because the state agency through which the provider is licensed mandates certain conduct through its licensing regulations. See *Gore* v. *People's Savings Bank*, 235 Conn. 360, 375, 665 A.2d 1341 (1995) ("requirement imposed by statute may establish the applicable standard of care"). Indeed, it is noteworthy that only two states have regulations stipulating that family child care homes and licensed child care centers must place infants in the nonprone position; four other states have similar regulations only for licensed child care centers. R. Moon, W. Biliter & S. Croskell, "Examination of State Regulations Regarding Infants and Sleep in Licensed Child Care Centers and Family Child Care Settings," 107 Pediatrics 1029, 1030–31 (May 2001). Connecticut has no regulations pertaining to infant sleep position, however. At the other end of the spectrum, constructive knowledge may be ascribed to a child care provider when the information as to the risk is ubiquitous and pervasive or is a matter of common sense. For example, no expert would be required to establish that a provider would be negligent by leaving an infant unattended in a filled bathtub.

dant's testimony did not establish the scope of the duty by which the jury could judge her conduct.

We conclude, therefore, that the defendant's testimony did not satisfy the requirement that the plaintiff must provide expert testimony to establish the requisite standard of care. Accordingly, the trial court improperly denied the defendant's motion to set aside the verdict. See *Danbury* v. *Dana Investment Corp.*, 257 Conn. 48, 58, 776 A.2d 438 (2001) ("plaintiff is limited to only one opportunity to prove its claim"); *Beach* v. *Milford Ice Co.*, 87 Conn. 528, 536, 89 A. 181 (1913) ("principle of public policy which gives every [person] one opportunity to prove his case, and limits every [person] to one such opportunity" [internal quotation marks omitted]).

The judgment is reversed and the case is remanded with direction to render judgment for the defendant.

In this opinion the other justices concurred.