## A97A2208. BYRON v. THE STATE.
### (495 SE2d 123)

RUFFIN, Judge.

A jury found Nathaniel Byron, Jr. guilty of armed robbery and aggravated assault. Byron appeals, enumerating 13 errors which he contends require reversal. We disagree and therefore affirm Byron's convictions.

1. We note initially that Byron, who is represented by counsel on appeal, has violated Court of Appeals Rule 27 (c) (1) in preparing his brief. This rule clearly provides that "[t]he sequence of argument or arguments in the briefs shall follow the order of the enumeration of errors, and shall be numbered accordingly." Court of Appeals Rule 27 (c) (1). Byron's arguments are not numbered and do not follow the order of his enumerations of error. This violation of the Court's rules not only impedes our review of the errors asserted, but also presents the risk that an asserted error will not be addressed because it cannot be correlated with any argument in the brief. See Court of Appeals Rule 27 (c) (2). Despite this violation we will, in accordance with the Appellate Practice Act, strive to review each asserted error supported in the brief by argument and citation of authority. See OCGA § 5-6-48 (b). Byron should not be penalized for the transgressions of appointed counsel.

2. Turning to the merits of Byron's appeal, the evidence, viewed in a light most favorable to support the jury's verdict, shows as follows. The victim in this case is Robert Miley, who at the time of the offenses was working as a clerk at the Dixie Station convenience store in Cook County, Georgia. At approximately 2:30 one morning during Miley's shift, he was emptying a mop bucket when Byron and two companions, Reno Byron and Barry Morrison, entered the store. When Miley looked to see who came in, Nathaniel Byron struck him in the back of the head with a heavy, flat iron. According to Miley, he fell to his knees, and when he got back to his feet and turned around, Nathaniel Byron struck him in the mouth. The second blow knocked out four of Miley's teeth. After attempting to strike Miley a third time with the iron, Nathaniel Byron and Reno Byron dragged him to the front of the store where they threatened to hit him again if he did not open the register. Miley complied with the demand, whereupon Nathaniel Byron and his two companions took the money from the register and a video recorder containing a surveillance tape and left the store.

At trial, Miley testified that he knew Nathaniel Byron was the individual who struck him because Byron came into the store every night and in fact had visited the store earlier that evening. Although Miley did not know Byron's name, he identified Byron in a photographic lineup presented to him after the incident and also identified

him at trial.

Despite Byron's failure to present any argument supporting his challenge to the sufficiency of the evidence, we have reviewed the transcript and find that in light of the State's eyewitness testimony identifying Byron as the perpetrator who struck Miley during the course of the robbery, there was sufficient evidence for the jury to find him guilty beyond a reasonable doubt of armed robbery and aggravated assault. See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Palmer v. State*, 219 Ga. App. 819, 820 (1) (467 SE2d 6) (1996).

3. As stated in Division 2, one of the reasons the victim was able to identify Byron was because Byron had visited the store earlier that evening. The transcript reveals that this earlier visit to the Dixie Station was recorded on a surveillance tape. According to the assistant district attorney, although the victim provided the investigating officer with the tape well before trial, the State learned of it only the day before trial. And, once the State viewed the tape, the assistant district attorney immediately notified Byron's counsel who viewed it later that day. Byron moved for a continuance arguing that the tape presented newly discovered evidence of the victim using racial epithets. The trial court denied Byron's motion and asked defense counsel whether he wanted the tape excluded from evidence. Byron's counsel stated that he wanted the tape excluded, and the trial court ruled accordingly and further prohibited any mention of the tape at trial. Byron asserts that the trial court erred in denying his motion for a continuance to investigate the information revealed on the tape. We disagree.

"All applications for continuance are addressed to the sound legal discretion of the court and shall be granted or refused as the ends of justice may require. [OCGA § 17-8-22.]" *Lakes v. State*, 244 Ga. 217, 218 (259 SE2d 469) (1979). In this case, Byron did not clearly show why he needed a continuance. Even if we assume that Byron wanted to develop evidence showing the victim harbored racial prejudices, Byron did not show the trial court how he intended to acquire such evidence or why he needed additional time. Considering the trial court's exclusion of the tape at Byron's request and the lack of clarity in Byron's motion for continuance, "[t]he record at best shows only speculative harm to [Byron] and is insufficient to show an abuse of discretion by the trial court. . . ." Id.

4. Byron also asserts that the trial court erred in failing to order a mistrial when the victim mentioned the surveillance tape during his testimony. We disagree. A trial court has broad discretion in ruling on a motion for mistrial, and such a ruling will not be overturned on appeal absent a manifest abuse of discretion. *Eagle v. State*, 264 Ga. 1, 2 (2) (440 SE2d 2) (1994).

In this case, the transcript shows that the victim mentioned the tape during cross-examination by Byron's counsel. Specifically, counsel was examining the victim about the description of people who entered the store with Byron earlier in the evening and asked him whether he could describe what one of the individuals was wearing. The victim answered: "Your guess is as good as mine, because I didn't — I just pay attention to when they come in the store. Three days later, I interviewed a tape, watch it, the surveillance tapes; make sure there ain't no shop lifting going on; and then that's it. In other words, after that 17 months ago or until now, I couldn't tell you hardly [sic]."

Byron does not show, and it is unclear from the transcript, how he was prejudiced by the reference to the surveillance tape. Moreover, it appears that the reference was the result of a nonresponsive answer to defense counsel's question, and not a consequence of any action by the State. Under these circumstances, we find no abuse of the trial court's discretion in the denial of Byron's motion for mistrial. See id.

5. Byron, who is African-American, asserts that the State engaged in purposeful discrimination in the exercise of its peremptory strikes and that the trial court therefore erred in denying his motion based on *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

"The trial court's decision [on a *Batson* motion] rests largely upon assessment of the prosecutor's state of mind and credibility; it therefore lies peculiarly within a trial judge's province. The trial court's factual findings must be given great deference and may be disregarded only if clearly erroneous." (Citations and punctuation omitted.) *Hightower v. State*, 220 Ga. App. 165, 166 (1) (469 SE2d 295) (1996).

The transcript shows that the State used all six of its peremptory strikes, and its strike in selecting an alternate juror, against African-American prospective jurors, and that following Byron's objection, the State explained its strikes. The district attorney explained that he struck four veniremen because they had familial or other relationships with individuals who had been prosecuted for various offenses. The district attorney stated that he struck another prospective juror because she had gone to school with Byron. The district attorney explained that he struck the last prospective juror because he "had some prosecution dealings" with her. Finally, the district attorney struck another African-American when deciding on an alternate juror because while serving on a jury earlier in the week the juror "made faces at the State . . . and [he] did not feel like she would be a good juror. . . ."

Byron asserts on appeal that the State's proffered explanations

were not race-neutral and that the trial court therefore erred in denying his motion. We disagree.

The threshold issue of whether Byron established a prima facie case of discrimination is moot because the State offered purportedly race-neutral reasons for its strikes. See *Byers v. State*, 212 Ga. App. 110, 112 (2) (441 SE2d 290) (1994). In light of such explanations, we must determine whether the State's proffered reasons for striking the jurors in question were race-neutral. *Jackson v. State*, 265 Ga. 897, 898 (2) (463 SE2d 699) (1995). Under existing precedent, a race-neutral explanation need not be persuasive, plausible or make sense, but is an explanation "based on something other than the race of the juror. Unless a discriminatory intent is inherent in the proponent's explanation, the reason offered will be deemed race[-]neutral." (Citations and punctuation omitted.) Id.

Under these guidelines, we are constrained to find that the State's explanations for all of its strikes were race-neutral. Considering those strikes based on the jurors' relationships with individuals who have been in trouble with the law, our Supreme Court has previously found that such a reason is race-neutral. See *Hall v. State*, 261 Ga. 778, 779 (2) (415 SE2d 158) (1991). We have also held that a juror's familiarity with a defendant or his family is a race-neutral reason to strike the juror. See *Hightower*, supra. The prosecutor's explanation that he did not think another individual would make a good juror because she had earlier "made faces at the State" is a race-neutral ground which, although difficult to understand from the transcript, is best left for judgment by the trial judge who was present and able to judge the credibility and demeanor of both the district attorney and the juror. See *Jones v. State*, 226 Ga. App. 428, 430 (1) (487 SE2d 62) (1997). The same must be said for the State's explanation that it struck a juror who had prior dealings with the district attorney's office. See id.; *Hightower*, supra.

"Because the State's given reasons were sufficient to rebut [Byron's] prima facie showing of racial discrimination, the central issue was properly framed for the trial court's determination: whether [Byron] carried his burden of showing the proffered reasons were merely designed to 'cover up' purposeful racial discrimination. [Cits.]" *Jones*, supra at 430 (1). Although Byron pointed out that the State did not strike a white juror who also went to school with him, "the trial court decided that issue of fact in favor of the State, and under our deferential standard of review, we cannot say the trial court's determination was clearly erroneous. [Cit.]" Id. This is true even though we may have reached a different conclusion from that of the trial judge.

6. In two enumerations of error, Byron asserts that the trial court erred in failing to enforce his subpoenas for the presence of two

witnesses, co-defendants Reno Byron and Barry Morrison. According to Byron, approximately one week before trial he learned that Reno Byron would be tried separately, and he therefore requested the issuance of subpoenas for both Reno Byron and Morrison.

Although Byron had a constitutional right to compulsory process to obtain the testimony of his witnesses, it was his duty to ensure the presence of such witnesses by issuance of subpoenas. See Ga. Const. of 1983, Art. I, Sec. I, Par. XIV; *Kegler v. State*, 267 Ga. 147, 148 (4) (475 SE2d 593) (1996); *Fowler v. State*, 195 Ga. App. 874 (2) (395 SE2d 33) (1990). Moreover, in deciding whether to enforce a subpoena, a trial court must consider "whether under the circumstances of each case the subpoena was served within a reasonable time, but in any event not less than 24 hours prior to the time that appearance thereunder was required." OCGA § 24-10-25 (a).

The record does not show that Byron's requested subpoenas were served more than 24 hours prior to trial. In fact, the record does not contain any evidence of the subpoenas or returns of service. Rather, it appears from colloquy between Byron's counsel and the trial judge that counsel requested subpoenas only the day prior to commencement of Byron's trial. Considering that the trial proceedings commenced at 9:00 a.m., it is highly unlikely that the requested subpoenas were served more than 24 hours prior to the trial. Accordingly, inasmuch as Byron has not shown that the subpoenas were issued in a timely manner, the trial court did not err in failing to enforce the subpoenas. See *Fowler*, supra.

7. We find no merit in Byron's assertion that he was denied a speedy trial. Byron filed his request for a speedy trial on July 8, 1996. Byron's trial commenced in Cook County Superior Court on February 21, 1997. OCGA § 17-7-170 (b) requires that a person be tried within the term of court in which a demand for trial is made or at the next succeeding regular court term. Cook County has two terms of court which commence on the second Monday in January and July. OCGA § 15-6-3 (1) (D). Byron's request was made on the first day of the July 1996 term and he was tried at the next succeeding term. Accordingly, we find no error.

8. In four enumerations of error, Byron asserts that the trial court erred in admitting evidence of a photographic lineup and the victim's in-court identification of him. However, in his brief, Byron only incoherently addresses these assertions. We will, to the extent possible, address Byron's apparent concerns.

The facts relevant to these assertions show that on the day after the assault and robbery, the victim provided the investigating officer with a description of his assailant. Based on this description, the officer compiled a photographic lineup and presented it to the victim approximately three weeks later. According to the officer, the victim

pointed to Byron as the individual who committed the offenses. After the lineup, police obtained a warrant and arrested Byron for the offenses. It appears that at some point following Byron's arrest, the victim saw Byron either at the jail or the courthouse and told the investigating officer "that's the one that hit me in the head. . . ." Finally, the victim positively identified Byron at trial.

Byron first seems to contend that the trial court should have excluded evidence of the lineup at trial because he was provided with a copy of the lineup only on the morning of trial. Byron does not show, however, that he ever objected to the lineup being admitted into evidence on this ground. Accordingly, this contention presents nothing for review. See *Thomason v. State*, 215 Ga. App. 189, 190 (4) (450 SE2d 283) (1994).

Byron also argues that the victim's in-court identification should have been excluded because he did not have an attorney present when the victim identified him in the photographic lineup or when the victim subsequently pointed him out to the investigating officer. Pretermitting a determination of the propriety of these pretrial identifications, we find that because the victim's in-court identification had an independent origin in his numerous prior encounters with Byron and his ability to view him in the convenience store during the incident, it was properly admitted by the trial court. See *Montgomery v. State*, 210 Ga. App. 147, 149 (3) (b) (435 SE2d 510) (1993).

9. Finally, Byron asserts that the trial court erred in failing to grant a mistrial when the State, through the investigating officer's testimony, put Byron's character into evidence.

The transcript reveals, however, that the testimony was elicited by *Byron's counsel* while cross-examining the investigating officer about the description of Byron the officer was provided. Counsel asked the officer: "you say the description that was given to you for him was a black male, tall, about 160 pounds, is that right? A. Yes, Sir. Q. Do you know how much this gentleman weighs? A. Well, at the time — he's been here about two years now, so, at the time, he was pretty close to 160 pounds." Following this response, Byron moved for a mistrial on the ground that the answer indicated that he had been in jail the previous two years. In making his motion, however, counsel conceded that the officer's answer "was not responsive to [his] questions."

Under these circumstances, we find that the trial court did not abuse its discretion in denying Byron's motion for mistrial. "[A] nonresponsive answer that impacts negatively on a defendant's character does not improperly place the defendant's character in issue." *Eagle*, supra at 2 (2), citing *Jones v. State*, 257 Ga. 753, 759 (363 SE2d 529) (1988).

*Judgment affirmed. Birdsong, P. J., and Eldridge, J., concur.*

DECIDED DECEMBER 11, 1997.

*Jack W. Carter*, for appellant.

*Robert B. Ellis, Jr., District Attorney, Ellen S. Golden, Assistant District Attorney*, for appellee.