A09A0475. SHEPPARD v. THE STATE.

(678 SE2d 509)

MILLER, Chief Judge.

A Chatham County jury convicted John Anthony Sheppard of two counts of possession of a firearm during the commission of a crime (OCGA § 16-11-106) and a count each of kidnapping (OCGA § 16-5-40), aggravated assault (OCGA § 16-5-21), and possession of a firearm by a convicted felon (OCGA § 16-11-106). Sheppard appeals following the denial of his motion for a new trial, as amended, arguing that the trial court erred in (1) allowing him to represent himself when he was competent to stand trial but suffered from mental illness; (2) requiring him to go to trial without adequate time to retain counsel and prepare; (3) depriving him of his constitutional right to compel attendance of witnesses; and (4) failing to charge the jury on his sole defense of mistake of fact. Discerning no error, we affirm.

*Facts.* Viewed in the light most favorable to the verdict (*Drammeh v. State*, 285 Ga. App. 545, 546 (1) (646 SE2d 742) (2007)), the record shows that on September 3, 2006, Sheppard's brother, Danny Sheppard ("Danny") and his fiancée, Stephanie Childs, were staying with Childs' friend, Kelly Boyd, because they were considering purchasing Boyd's house. That afternoon, Danny, Childs, and Boyd were away from the house visiting Boyd's parents. Around 5:45 p.m., Boyd decided to go home while Danny and Childs stayed behind.

When Boyd arrived at her house, she discovered Sheppard sleeping on the living room sofa. Boyd asked Sheppard who he was, and he identified himself as Danny's brother, John. Boyd walked outside and called Danny on her cell phone. When Boyd advised Danny that Sheppard was at the house, Danny told her that he would be right there. After the call ended, Danny called back and asked Boyd to wait outside until he arrived. Danny also called one of Boyd's neighbors, Keiffer Parker, and asked him to go over to Boyd's house to make sure everything was all right.

While Boyd was waiting for Danny, Sheppard came outside and demanded that Boyd get back in the house. When Boyd refused, Sheppard lifted his shirt, revealing a handgun in the waistband, and told Boyd to go inside or he would shoot her. Boyd then went inside, where Sheppard told her to sit on the sofa. Sheppard pulled the gun from his waistband and began ranting and raving and asking Boyd why she was calling the police. He told her that if the police showed up, he was going to shoot her. While Sheppard was pacing, Boyd noticed a shotgun leaning against the wall across the room. Sheppard put the smaller handgun back in his waistband, picked up the shotgun, and continued to rant and rave and threaten to kill Boyd if she called the police.

After about five minutes, the doorbell rang. Sheppard threatened to kill Boyd if the police were at the door. Sheppard started to answer the door himself but then asked Boyd to do so. Just before she stood up from the sofa, Boyd saw Parker walking around the back of the house. As she approached the door, Boyd felt the barrel of the shotgun on her back, and Sheppard again stated that he would kill her if the police were at the door. Boyd looked through the peephole and told Sheppard that no one was there, but Sheppard continued his threats.

While Boyd was standing at the front door, Danny called her on her cell phone, and Boyd handed the phone to Sheppard. Shortly thereafter, Danny and Childs arrived. Danny ran into the house, where he found Sheppard standing next to Boyd with two guns in his hands. Boyd ran out of the house, and Danny succeeded in disarming Sheppard. When Boyd went back inside, she noticed a number of beer bottles lying near the sofa.

*Mental Competency Evaluation.* The trial court ordered a pre-trial mental evaluation of Sheppard, inter alia, to assess his competency to stand trial and his mental competence at the time of the alleged crimes. Nic D'Alesandro, Ph.D., Forensic Services Director at Georgia Regional Hospital at Savannah, conducted an evaluation on March 21, 2007. Despite noting that Sheppard presented with a history of alcohol abuse and associated disorders, Dr. D'Alesandro reported that "there was no indication that Mr. Sheppard suffered from a major psychiatric disorder of either mood or thought." Dr. D'Alesandro concluded that Sheppard was competent to stand trial and that he judged Sheppard to be responsible for the acts under review.

*Sheppard's Motion to Dismiss Counsel and Decision to Proceed Pro Se.* On June 1, 2007, just three days prior to trial, Sheppard filed a motion to dismiss his court-appointed counsel. During a hearing on Sheppard's motion and the State's similar transaction motion that same day, Sheppard advised the trial court that his appointed attorney and another public defender in attendance "[a]re not my counsel." Sheppard claimed that his parents had hired private counsel the day before, but when the trial court contacted the attorney Sheppard specified, he advised the trial court that he had not entered into an agreement to represent Sheppard. Sheppard then conceded that he did not know if his parents were going to hire that particular attorney but insisted that his parents were getting him a new lawyer. The trial court told Sheppard that his counsel would have to proceed with trial in three days and advised him that "[y]our other choice, obviously, is to represent yourself, something that I highly caution you against. . . ."

After Sheppard indicated that he wanted to represent himself, the trial court warned Sheppard multiple times in strong terms that proceeding without counsel would be a poor choice but ultimately allowed him to present an argument in response to the State's similar transaction motion. The trial court, however, required Sheppard's appointed counsel to remain in the courtroom as standby counsel. After ruling that the similar transaction, a 1993 conviction for possession of a firearm by a convicted felon, was admissible, the trial court cautioned Sheppard yet again that it would be a "bad choice" to represent himself.

On the day of trial, Sheppard continued to insist that he would not accept the services of his appointed counsel. When the trial court inquired if Sheppard was going to represent himself, Sheppard responded, "I need a public defender other than her." The trial court advised Sheppard that his choices were to represent himself or to accept representation from his appointed counsel, and Sheppard responded, "I'm representin' myself but I'm . . . I'm gonna get a

attorney." When trial court asked who his attorney was, Sheppard replied "me." Shortly thereafter, Sheppard's mother was granted permission to address the court and asserted, among other things, that Sheppard "has a severe mental disorder. He's bipolar, he has multiple personalities and he's had severe problems since the age of four. He is not competent to represent himself. . . ." No evidence was presented to substantiate these claims.

After warning Sheppard two more times about the difficulties and disadvantages inherent in self-representation, the trial court permitted Sheppard to represent himself during voir dire with his public defender in the room as standby counsel. Following voir dire, the trial court urged Sheppard to accept the services of his appointed counsel. Sheppard acquiesced and stated that he would do so but prior to opening statements changed his mind again. At that point, the trial court engaged in an extensive colloquy with Sheppard to confirm that he understood the consequences of his decision. For example, the trial court asked Sheppard if he understood that if he proceeded pro se, he would not later be able to claim on appeal that he received ineffective assistance of counsel at trial. Sheppard responded affirmatively. The trial court thereafter found that Sheppard had knowingly, voluntarily, and intelligently waived his right to counsel at trial and allowed him to proceed pro se.

1. Sheppard claims that, because he suffers from mental illness, the trial court should not have allowed him to represent himself at trial. We disagree.

Sheppard does not dispute his competency to stand trial, which is measured under the standard set forth in *Dusky v. United States*, 362 U. S. 402 (80 SC 788, 4 LE2d 824) (1960). Under *Dusky*, a defendant is competent to stand trial if "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "he has a rational as well as factual understanding of the proceedings against him." (Punctuation omitted.) Id. at 402. Nor does Sheppard challenge his competency to waive his right to counsel at trial, which is evaluated under the same test as competency to stand trial. *Lamar v. State*, 278 Ga. 150, 151 (1) (a) (598 SE2d 488) (2004) (citing *Godinez v. Moran*, 509 U. S. 389 (113 SC 2680, 125 LE2d 321) (1993)). Sheppard's claim of error is premised on the U. S. Supreme Court's recent opinion in *Indiana v. Edwards*, ___ U. S. ___ (128 SC 2379, 171 LE2d 345) (2008), which considered a question left unanswered by prior Supreme Court precedents: whether a State may limit a defendant's right of self-representation on the ground that he or she lacks the mental capacity to conduct a defense at trial, even if the defendant is competent to stand trial and has validly waived the right to counsel.

Id. at 2381, 2385. The Supreme Court answered the question in the affirmative, holding:

> [T]he [U. S.] Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

Id. at 2387-2388. No prior opinion from this Court or the Supreme Court of Georgia has addressed or applied the holding in *Edwards*.

Under the facts of this case, we conclude that Sheppard's reliance on *Edwards* is unavailing. Before finding that Sheppard had knowingly and voluntarily waived his right to counsel and before allowing him to proceed pro se, the trial court noted that it had the opportunity to observe Sheppard during voir dire, when, against the trial court's advice, he represented himself. The trial court stated:

> He is . . . he appeared to be clear-eyed, to understand what he is doing, to be oriented as to time and place. I am obviously not a mental health professional, I am relying on Dr. D'Alesandro's reports to that effect, but . . . but the man that I see here in front of me appears capable of . . . of speaking and of representing . . . or of . . . of explaining his point of view.

The trial court also indicated that it considered, among other things, Sheppard's background, training, and education. Although Sheppard was tried prior to the U. S. Supreme Court's decision in *Edwards*, the record before us demonstrates that, consistent with *Edwards*, the trial court took "realistic account" of Sheppard's mental capacity to represent himself at trial before allowing him to do so. We find no basis in the record to disturb the trial court's decision that Sheppard was competent to represent himself at trial. See *Edwards*, supra, 128 SC at 2387 ("[T]he trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant.").

The evidence before the trial court did not indicate that Sheppard suffered from severe mental limitations. Dr. D'Alesandro

YALE LAW LIBRARY

reported that throughout his interview with Sheppard,

> he maintained an orientation in all spheres, was free from both hallucinatory and delusional activity and denied suicidal as well as homicidal ideation. Specifically, at the time of this current assessment there was no indication that Mr. Sheppard suffered from a major psychiatric disorder of either mood or thought, nor required inpatient psychiatric hospitalization.

Dr. D'Alesandro went on to observe that Sheppard "remains free from major psychiatric symptoms." Compare *Edwards*, supra, 128 SC at 2382 (evidence in record indicated that defendant suffered from "serious thinking difficulties and delusions" and schizophrenic illness).

We disagree with Sheppard's contention that, having ordered a mental evaluation of Sheppard which was conducted shortly before trial, the trial court had a duty to conduct a further investigation of Sheppard's mental health status based on his mother's claims on the first day of trial that he was severely mentally ill. If evidence contradicting Dr. D'Alesandro's conclusions existed, neither Sheppard, his mother, or anyone else provided it to the trial court. We note that although Sheppard was represented by counsel at the hearing on his motion for a new trial, he presented no further evidence regarding his mental health status.

Sheppard argues that his expressions of intent to secure new counsel before trial and his temporary change of heart about whether he would let his appointed counsel represent him were indicative of mental illness. We have no reason to view such conduct as symptomatic of mental illness, and Sheppard's vacillation about whether he wished to represent himself could also evidence his understanding of the gravity of his decision to proceed pro se. Sheppard also relies on his statement to the jury at the end of his opening argument that "you know my mind's scrambled, I'm still, you know, blurry vision and everything, but I'm trying to get it worked out." Earlier in the opening, Sheppard had mentioned that he was recently "pistol whipped" at work, which was causing him problems with his vision. Notwithstanding these statements, Sheppard presented a coherent opening, offering his own account of events, which differed from Boyd's. Finally, we reject Sheppard's contention that he was not mentally competent to represent himself in view of the fact that, from time to time, the trial court had to instruct him on matters such as how to properly mark exhibits, the proper form of questions during cross-examination, and how to proceed when he took the stand to testify. Any layperson might

require such instructions, and their necessity did not require the trial court to conclude that Sheppard was mentally incompetent to represent himself.

2. Sheppard contends that the trial court abused its discretion in failing to continue the trial of his case to give him time to retain counsel and prepare. Although he stated during the hearing on his motion to dismiss counsel and prior to trial that he wanted a new lawyer and intended to hire one, Sheppard never moved for a continuance to do so. As such, Sheppard waived this claim of error. *Watts v. State*, 265 Ga. 888 (2) (463 SE2d 696) (1995).

3. Sheppard contends that the trial court deprived him of his constitutional right to compel attendance of witnesses. We disagree.

The record shows that when the trial court was engaged in a colloquy with Sheppard about his decision to proceed pro se, it asked Sheppard whether he understood that, among other things, his appointed counsel would subpoena witnesses on his behalf. Sheppard advised the trial court that within the past two weeks, he had told his lawyer about some witnesses he needed for trial. Appointed counsel then explained that Sheppard had asked her to subpoena "character witnesses" but she did not do so because she believed the relevance of their testimony was limited and that they could be detrimental to his case. The trial court advised Sheppard that, as a pro se defendant, it would be his duty to subpoena any witnesses he required.

"[H]aving elected to represent himself, it was [Sheppard's] responsibility, not the trial court's to ensure the presence of his witnesses by issuance of subpoenas. OCGA §§ 24-10-20 (b); 24-10-21." *Kegler v. State*, 267 Ga. 147, 148 (4) (475 SE2d 593) (1996); see also *Byron v. State*, 229 Ga. App. 795, 799 (6) (495 SE2d 123) (1997) ("Although Byron had a constitutional right to compulsory process to obtain the testimony of his witnesses, it was his duty to ensure the presence of such witness by the issuance of subpoenas.") (citations omitted). The record does not disclose that Sheppard ever requested issuance of subpoenas or the trial court's assistance in enforcing them, and, as such, his right to compulsory process was not violated. To the extent Sheppard is arguing that the trial court should have continued his trial to allow him to subpoena witnesses, his claim is barred because he never moved for a continuance. See Division 2, supra.

4. Finally, Sheppard claims that the trial court erred in failing to instruct the jury on his "sole defense" of mistake of fact despite his failure to request such a charge in writing. We disagree.

"While a trial court is required to charge on a criminal defendant's sole defense of mistake of fact even absent a request to do so, such a charge is not required where it is not authorized by the evidence." (Citation omitted.) *Randall v. State*, 234 Ga. App. 704,

705 (1) (507 SE2d 511) (1998). Sheppard testified at trial that he thought that Boyd's house belonged to Danny and that when Boyd woke him up, he was confused and could not see well because of his recent work-related injury. Sheppard claimed that he did not know if Boyd was Danny's friend "or I was being robbed." Danny also testified that Sheppard thought Boyd was breaking in. But neither Sheppard nor Danny testified that this alleged misapprehension caused Sheppard to force Boyd inside the house at gunpoint and hold her there, while repeatedly threatening to kill her. Instead, Sheppard testified that Boyd walked outside but then came back into the house and sat on the couch and that the two talked until Danny arrived. According to Sheppard, he and Boyd "had a disagreement, you know, 'cause it was . . . it startled her and we, you know, like were talking back and forth and sayin,' you know, well, I don't know who you are. . . ." On cross-examination, Sheppard testified that he did not "remember anything about, you know, what [Boyd is] claimin'. " Given that Sheppard disputed Boyd's account that he held her at gunpoint and threatened her, he was not entitled to an instruction on mistake of fact. "One cannot deny committing an act, while at the same time argue he committed the act by mistake." *Williams v. State*, 221 Ga. App. 296, 297 (1) (471 SE2d 258) (1996). "Accordingly, the evidence adduced at trial clearly did not authorize a charge on mistake of fact. . . ." Id. (Citation and punctuation omitted.)

For the reasons set forth above, we affirm the trial court's order denying Sheppard's motion for a new trial.

*Judgment affirmed. Andrews, P. J., and Barnes, J., concur.*

DECIDED MAY 13, 2009

John V. Lloyd, Christopher A. Townley, Ann Willard Fiddler, for appellant.

Spencer Lawton, Jr., District Attorney, Ronald M. Adams, Assistant District Attorney, for appellee.